**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KNOGO CORPORATION, Respondent.**

**No. 60, Docket 83–4062.**

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1983.

Decided Feb. 3, 1984.

Allison W. Brown, Jr., Atty., National Labor Relations Board, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Sandra Shands Elligers, Atty. National Labor Relations Board, Washington, D.C., of counsel), for petitioner.

Clifford P. Chaiet, Jericho, N.Y. (Pearl & Chaiet, P.C., Jericho, N.Y., of counsel), for respondent.

Before LUMBARD, OAKES and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

In this consolidated proceeding, the National Labor Relations Board, pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1976), petitions for enforcement of two of its orders issued against Knogo Corporation. The orders, issued on July 27, 1982 (Knogo I) and December 14, 1982 (Knogo II) require Knogo to cease and desist from certain unlawful practices, to offer to reinstate an employee with back pay, to rescind disciplinary warnings against two other employees, and to recognize and bargain collectively with Local 810 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"). For the reasons set forth below, we grant enforcement except for the Board's order which requires Knogo to bargain with the Union.

I.

Knogo manufactures electronic anti-shoplifting devices at its plant in Hicksville, New York. In mid-June, 1978, the Union began an organizing campaign among Knogo's employees, conducted by Field Representative David Sapenoff. During lunch and other breaks, Sapenoff approached employees and distributed literature in the employee parking lot in the rear of Knogo's

plant, and in the driveway leading to the rear lot. Although management asked him to leave company property at least twice in the early months of the campaign, Sapenoff continued to hand out literature and cards without interruption.

On June 16, 1978, during lunch hour, Sapenoff approached Patrick Bellucci and Paul Vigliotti. Bellucci had been an employee for nine months, and had been promoted and given two raises. The men talked for fifteen minutes, and were observed by Foreman Michael DiPietro. Upon re-entering the building, Bellucci volunteered that he had talked with a union representative, and was impressed with his ideas. DiPietro responded that the Union had good points and bad points, and asked Bellucci if he had signed a union authorization card. Bellucci truthfully responded that he had not. Within three days though, Bellucci did sign a card, and he started distributing leaflets and soliciting signatures on authorization cards.

On June 21, Bellucci bought lunch from a food truck that came to the plant daily. After lunch, he felt sick, and asked Vigliotti to punch his time card out and tell Foreman DiPietro that he had gone home. Vigliotti did punch Bellucci's time card at 12:29 P.M. Upon his arrival at work the next day Bellucci was informed by DiPietro that he was fired because he had gone home without permission.

On June 26, 1978, Sapenoff distributed literature calling for an organizing meeting at a nearby bar two days later. Fifteen employees attended the meeting. Shortly after it began, however, Plant Manager Paul Montalbano entered and sat down among the employees. When he was told that the meeting was for employees only, and asked to leave, Montalbano moved to the bar area. Sapenoff tried to restart the meeting, but the employees were uneasy and the meeting broke up. A second meeting was called several weeks later; this time only two employees attended.

The organizing campaign continued at a slow pace during the fall of 1978, but picked up in December. That month, Director of Operations Michael Trentacosti directed Knogo's labor relations consultants to design a benefits package for Knogo employees. Although this was not a regularly scheduled revision of benefits, work continued on the package despite advice from the labor relations consulting firm and Knogo's attorneys that the Company should not change policies during the organizing campaign.[1] On March 7th, a handbook was issued to all employees listing the new benefits.

On May 1, Sapenoff, believing that the Union had secured majority status among the employees, met with Trentacosti in Knogo's office concerning recognition and bargaining. When Sapenoff arrived the next day to continue his organizing activities, he saw workmen building a fence at the rear of the parking lot. By May 10, a six foot high fence topped with barbed wire surrounded the parking lot. Sapenoff was prevented from entering the lot by guards who told him they were instructed to keep him out. Thus, Sapenoff and other organizers could only speak to employees who stopped their cars as they approached or left the lot. Entry to the lot by others, such as food trucks, delivery trucks, friends and relatives of employees, and a former employee organizing softball games, was not restricted.

By June 14, 1979, the Union had obtained union authorization cards from 52 of the 101 employees then in the bargaining unit. At the request of the Union, an election was scheduled by the NLRB for July 20.

On July 11, nine days before the election, Anthony Minasy, Knogo's President, summoned to his office seven employees, selected because they were thought to have influence over other workers and had been ob-

---

1. Knogo was well aware of the progress of the organizing efforts. In February, 1979, when management learned of a Union leaflet claiming majority support, Knogo filed a petition with the Board to force an election. The petition was dismissed since no claim for representation had been made by the Union.

served in union activities. He told them he wanted them to carry the Company's message to other employees. That message was that while the employees had the right to organize and have a union represent them, this union could not guarantee that it would deliver on its promises, and that the employees should shop around because there were many unions who would be more dedicated to their needs than this one. When Minasy asked if any of the employees at the meeting had worked in a plant where they had made less money, one employee, Nick Christofides, answered that he had. Minasy asked why didn't he go organize there; when Christofides inquired about a raise, Minasy answered that he could always get another job.

After the meeting, Christofides was concerned as to why Minasy considered him to be a union organizer. Later in the day, when Foreman DiPietro went to Christofides' work station to adjust a machine, Christofides explained to him that he had just been to a meeting with Minasy, and asked DiPietro if he knew why management considered him an organizer. DiPietro asked Christofides if he was a union organizer and whether he had signed a union card; Christofides answered "no" to both questions.

During the week preceding the election, Minasy held a series of about eight meetings, each with seven to ten employees, in Knogo's conference room. At each meeting he read a prepared statement which stated that the reason the improved benefits package wasn't implemented was that the Union had challenged it, and that the Union was made up of "racketeers" who promised a lot but could not deliver on those promises.

On July 20, 1979, the Board conducted an election, in which the Union lost 68–21, with 14 ballots challenged. The Un-

ion filed objections to the election, based on alleged unfair labor practices. Hearings on its objections were held in the fall of 1979.

On September 18, 1980, ALJ Robert M. Schwarzbart issued his *Knogo I* decision. He found that Knogo had committed unfair labor practices in violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1),[2] by:

(a) Coercively interrogating employees about their union activities and sympathies.

(b) Engaging in and creating the impression that it was engaging in the surveillance of the union activities of its employees.

(c) Disparately enforcing a rule, practice or policy which restricted or forbade access to its employee parking lot by non-employees.

(d) Granting new economic benefits to its employees during the Union's organization campaign to discourage support for the Union.

(e) Blaming the Union and its organizing drive during the critical period before the election, that further economic benefits could not be afforded to employees.

(f) Coercively singling out employees who are known union adherents, in the critical period before the election, to meet with management in a locus of authority.

The ALJ also held that Knogo violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3),[3] by firing Patrick Bellucci for engaging in union activities.

The ALJ recommended that Knogo cease and desist from its unfair labor practices, that it offer to reinstate Bellucci to his former position with back pay and no loss of seniority, and that the results of the

---

2. Section 8(a)(1) of the Act provides that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." Section 7 of the Act, 29 U.S.C. § 157, provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, [and] to bargain col-

lectively through representation of their own choosing . . . ."

3. Section 8(a)(3) of the Act provides that it shall be an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

election be set aside and Knogo ordered to recognize and bargain collectively with the Union.

In October, 1980, one month after the ALJ issued his recommendation, Knogo President Minasy met with employees, and notified them that the election had been set aside and that Knogo would appeal the decision. On October 14, 1980, employee Ira Klein prepared a sign reading "Vote Union". He, along with another employee, William Layton, posted the sign in the production area. A third employee, Donna Pizzo, ripped down the sign and threw it away. An argument ensued between Klein and Pizzo. A supervisor reprimanded both Klein and Pizzo for causing a work stoppage, and both were warned that if further arguments erupted they would be disciplined. After the supervisor reported the incident to Director of Operations Trentacosti, written warning notices were issued to Klein and Layton, but not to Pizzo. The Union filed a complaint, and hearings were held in March, 1981.

On September 1, 1981, ALJ Winifred M. Morio issued a decision in *Knogo II,* finding that Knogo violated sections 8(a)(1) and (3) of the Act by giving warnings to Klein and Layton for engaging in union activities. Also, she found that, conditional upon the Board's issuing a bargaining order in *Knogo I,* Knogo violated 8(a)(5) of the Act by unilaterally granting wage and benefits increases in December 1980 without bargaining with the union. The ALJ recommended that the Board order Knogo to rescind the warnings given Klein and Layton, and to bargain with the union before making any changes in terms and conditions of employment.

## II.

The Board affirmed the decisions of both ALJs. On July 27, 1982, it adopted the recommendations made in *Knogo I.* 262 NLRB No. 171. On December 14, 1982, it adopted the recommendations made in *Knogo II* concerning the disciplinary warnings to Klein and Layton and unilateral changes

in wages and terms of employment.[4] 265 NLRB No. 130. This consolidated appeal followed.

The scope of our review of the Board's findings "that an employer's conduct interferes with employee's rights of association" is quite limited. *N.L.R.B. v. Hendel Manufacturing Co.* 483 F.2d 350, 352–353 (2d Cir.1973). Thus, we must affirm the Board's conclusions if supported by substantial evidence in the record as a whole. *N.L.R.B. v. Geri-Care, Inc.,* 697 F.2d 56, 59–60 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983); *N.L.R.B. v. International Metal Specialties, Inc.,* 433 F.2d 870, 871 (2d Cir. 1970), *cert. denied,* 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971). In weighing that evidence, we defer to credibility determinations made by the trier of fact. *N.L. R.B. v. Independent Ass'n of Steel Fabricators,* 582 F.2d 135, 151 (2d Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). We are satisfied that the record amply supports the Board's finding of a pervasive pattern of unfair labor practices. We affirm those findings, and order Knogo to remedy the improper discharge of Bellucci by offering to reinstate him without loss of seniority or pay, and to rescind the improper disciplinary notices to Klein and Layton.

However, we decline to adopt the Board's final directive that Knogo bargain with the Union. A bargaining order may be properly issued, notwithstanding that a union had not been duly elected, if "outrageous" and "pervasive" unfair labor practices have made a fair election impossible, leaving a bargaining order as the only effective remedy to protect the union's rights; or in "less extraordinary cases," where the "possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and ... employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order ...." *N.L.R.B. v.*

**4.** The Board rejected various other recommen- dations made by the ALJ in *Knogo II.*

*Gissel Packing Co.,* 395 U.S. 575, 613–15, 89 S.Ct. 1918, 1939–40, 23 L.Ed.2d 547 (1969). In this case, we are confronted with a pervasive pattern of unfair labor practices. At least two of those practices, the improper discharge of Bellucci and the granting of new benefits to discourage employees' supporting the Union, constitute so-called "hallmark" violations which have been said will normally support the issuance of a bargaining order. *N.L.R.B. v. Jamaica Towing, Inc.,* 632 F.2d 208, 212–13 (2d Cir.1980).

 Nevertheless, an election is the clearly preferred remedy; a bargaining order is a drastic remedy, justified "only when an election is unlikely to reflect the uncoerced preference of the bargaining unit." *N.L.R.B. v. Marion Rohr Corp., Inc.,* 714 F.2d 228, 230 (2d Cir.1983). Thus, even where "hallmark" violations have occurred, a bargaining order may not be appropriate where "significant mitigating circumstances exist," *N.L.R.B. v. Jamaica Towing, supra,* 632 F.2d at 212; *J.J. Newberry Co. v. N.L.R.B.,* 645 F.2d 148, 153 (2d Cir.1981).

 Among the possibly mitigating factors the NLRB was obliged to consider were the passage of time and rate of employee turnover since the time of the violations. *N.L.R.B. v. Marion Rohr Corp., Inc.,* 714 F.2d 228, 231 (2d Cir.1983). It considered neither. In this case, three years had elapsed between the election in July, 1979, and the Board's issuance of the bargaining order in July, 1982. That substantial lapse of time casts doubt on whether the employee preference for the union, expressed prior to the 1979 elections through authorization cards, still reflected majority will, and thus would strongly argue for a new election. Although "we must guard against rewarding an employer for his own misconduct or delaying tactics," *N.L.R.B. v. Jamaica Towing, Inc., supra,* 632 F.2d at 214, the Board conceded at oral argument that Knogo was not responsible for at least twenty-two months of that lapse, from the time the

ALJ recommended in September, 1980, that a bargaining order be issued, until its issuance in July, 1982.

Moreover, the Board denied Knogo's motion to reopen the record to show that as of November 10, 1982, there had been considerable turnover in the bargaining unit since the unfair labor practice complained of, so that only a small minority of the current employees had ever expressed support for the Union. In particular, Knogo alleged that as of the date of its motion, the bargaining unit had shrunk from 101 employees to 52, only twenty of whom were employed at the time of the July, 1979, election and only seven of whom had signed authorization cards. We have consistently held that when there has been a large turnover in employees between unfair practices and a Board's order, "[t]he effect of a bargaining order could thus easily be to impose upon the employees a union not desired by the majority of them." *J.J. Newberry Co. v. N.L.R.B., supra,* 645 F.2d at 154; *see N.L.R.B. v. Pace Oldsmobile,* 681 F.2d 99, 100 (2d Cir.1982) (per curiam); *N.L.R.B. v. Chester Valley, Inc.,* 652 F.2d 263, 273 (2d Cir.1981); *N.L.R.B. v. Jamaica Towing, supra,* 632 F.2d at 214.

However appropriate the ALJ's recommendation of a bargaining order may have been when made in 1980, the Board was obliged to find that a bargaining order was necessary when it was issued. *N.L.R.B. v. Marion Rohr Corp., Inc.,* 714 F.2d 228, 231 (2d Cir.1983). Accepting as true Knogo's allegations that 60% of the current unit were not employees at the time of the violations and that of the old employees, almost two-thirds had not signed cards, it seems to us inappropriate to foist the Union upon all employees without a reasoned finding that a free election now, more than four years after the violations, is improbable. Because it ignored the passage of time and employee turnover, the Board failed to make such a reasoned finding. *Id.* at 231.[5] The effect

---

5. The Board attempts to distinguish *Marion Rohr* in two ways. First, it argues that in that case, one Board member dissented from the decision to issue a bargaining order, but here

the Board was unanimous. Second, it argues that in *Marion Rohr,* the alleged turnover occurred before the end of the Board's hearings, while here the turnover occurred after hearings

of our enforcing a bargaining order now would be to shift the burden to the employees to go through decertification proceedings. Accordingly, we deny enforcement of the bargaining order.

As over four years have now passed since the election, we see little reason to remand the case to the Board for further consideration, and we are not required to do so. *Marion Rohr Corp., Inc., supra,* 714 F.2d at 232. Enforcement of the Board's orders is granted, except for that portion which directs Knogo to bargain with the Union, enforcement of which is denied.[6]

were concluded. We do not consider either distinction relevant to our decision. Although in *Marion Rohr* we stated that where a Board member dissents from the bargaining order it is "especially important that the other two panel members carefully articulate the reasons why they believe a fair election cannot be held," 714 F.2d at 231, that does not imply that such a reasoned explanation of the need for a bargaining order is unnecessary when the Board is unanimous. Similarly, we find that it is irrelevant whether the turnover occurred before or after the conclusion of the hearings. In either case, the bargaining order must be necessary when issued. *N.L.R.B. v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 101 (2d Cir.1982) (per curiam). The fact that the Board took 22 months from the time ALJ Schwarzbart issued his opinion and the time it issued the bargaining order was not attributable to Knogo. Thus, the Board was obligated as much here as in *Marion Rohr* to consider employee turnover before issuing its order.

6. Our decision not to enforce the bargaining order necessarily means that we also reverse that part of *Knogo II* that found that Knogo violated section 8(a)(5) of the Act by increasing wages without notifying the Union, and that orders Knogo to cease and desist from "unilaterally changing terms and conditions of employment without notice to the Union and without affording it an opportunity to negotiate and bargain about such changes."