**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**J. COTY MESSENGER SERVICE, INC., Respondent.**

**No. 911, Docket 84–4162.**

United States Court of Appeals, Second Circuit.

Argued March 18, 1985.

Decided May 29, 1985.

Patrick J. Szymanski, Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich, Linda B. Weisel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Lloyd Somer, New York City, for respondent.

Before MESKILL and PRATT, Circuit Judges, and EDMUND L. PALMIERI, District Judge for the Southern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order entered on September 24, 1984, after it found respondent J. Coty Messenger Service, Inc. ("Coty") had violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "act"). 29 U.S.C. § 158(a)(1) and (3). The order requires Coty to cease and desist from various unfair practices, to reinstate an employee with back pay, and to bargain with the Amalgamated Messenger Union, Local 38–A, Service Employees International Union, AFL–CIO (the "union"), as the exclusive representative of Coty foot messenger employees. With the exception of that portion of the order requiring Coty to bargain with the union, we grant enforcement.

## BACKGROUND

Coty, a family owned messenger service with an office in Manhattan, employed approximately thirty-one individuals as foot messengers in April 1981. Richard Cotogno, who is vice-president, secretary, and treasurer of the corporation, controls its daily operations. The rest of the staff at the Manhattan office consists of four dispatchers.

In the Spring of 1981, the union began an organizational campaign among foot messengers working in New York City. Two of Coty's messengers, Anthony Caravello and Luis Olan, who had attended a union meeting and signed union authorization cards, agreed to solicit additional cards from Coty's other messengers. During the next few days, the two men spoke in favor of the union and gathered at least nineteen more signed union authorization cards. On April 24, with cards from at least twenty-one of Coty's thirty-one messenger employees, the union filed a petition for certification with the board. On May 4, the union filed a charge against Coty alleging violations of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act.

After a hearing, the administrative law judge issued a decision finding that Coty had repeatedly violated § 8(a)(1) of the act by: promising bonuses and increased benefits to discourage employee support for the union; threatening employees with closure of the business and discharge if the union became their collective bargaining representative; interrogating employees concerning their union activities; and influenc-

ing a former employee to ignore a subpoena validly issued by the board. The ALJ also found that Coty violated §§ 8(a)(1) and (3) by discharging Anthony Caravello for his union activities and by granting its employees a bonus to discourage support for the union. Based on these violations, the judge issued a recommended order requiring Coty to cease and desist from the found unfair labor practices or from interfering in any way with its employees' exercise of their collective bargaining rights, to offer Caravello immediate reinstatement with back pay, and to bargain, upon request, with the union as the exclusive representative of the messengers.

A three member panel of the board, with one member dissenting in part, affirmed the judge's findings, conclusions and rulings and adopted the recommended order with minor modifications. The board now petitions for enforcement of its order. In response, Coty contends that it did not commit any unfair labor practices, and that even if it did, a bargaining order is not warranted under the circumstances.

### Discussion

#### A. *The Unfair Labor Practices.*

 The scope of our review of the board's findings that an employer committed unfair labor practices is quite limited. *N.L.R.B. v. Knogo Corp.*, 727 F.2d 55, 59 (2d Cir.1984). Coty's claims are almost entirely factual and must be rejected if there is substantial evidence in the record to support the board's conclusions. *N.L.R.B. v. Heads & Threads Co., a Division of MSL Industries, Inc.*, 724 F.2d 282, 287 (2d Cir. 1983). The findings of the board cannot be lightly overturned, particularly when they are based upon the board's assessment of witness credibility. *N.L.R.B. v. American Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir. 1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983). Indeed, credibility findings made by an ALJ and accepted by the board cannot be overturned unless they are "hopelessly incredible" or they "flatly contradict" either the "law of nature" or "undisputed documentary testi-

mony." *Id.* (*citing N.L.R.B. v. Columbia University*, 541 F.2d 922, 928 (2d Cir.1976) and *N.L.R.B. v. Dinion Coil Co.*, 201 F.2d 484, 490 (2d Cir.1952)). Bearing in mind the limited nature of our review, we briefly address Coty's contentions.

#### 1. *Additional Benefits.*

 An employer violates § 8(a)(1) of the act when it grants or promises to grant benefits to discourage employee support for a union. *See, e.g., N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459–60, 11 L.Ed.2d 435 (1964); *N.L.R.B. v. Jamaica Towing, Inc.*, 632 F.2d 208, 212 (2d Cir.1980); *N.L.R.B. v. International Metal Specialties, Inc.*, 433 F.2d 870, 871–72 (2d Cir.1970), *cert. denied*, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971). An employer may not engage in any conduct immediately favorable to the employees if it is undertaken with the express purpose of impinging upon their choice for or against a union. *Exchange Parts Co.*, 375 U.S. at 409, 84 S.Ct. at 459–60. Coty contends that it never gave or promised benefits in order to thwart the union campaign.

Cotogno testified that he had decided far in advance of the union organizing campaign to begin awarding bonuses for employee punctuality to remedy a tardiness problem. But one of Coty's messengers testified that when Cotogno announced the bonus plan at a meeting of the messengers, he said that it was "to stop the union, you know, to avoid it." Another messenger testified that Cotogno told them that he could not afford a union and that the best he could do was to offer them a bonus for good attendance. The ALJ specifically discredited Cotogno's contention that the bonus plan had been under consideration before the union campaign and found similar testimony by the dispatchers to be contradictory and unreliable.

Further, several messengers testified that Cotogno offered additional employee benefits during the meeting. Cotogno claimed that he only described existing benefits, and in fact had told the employees

that the company could not afford to give them medical benefits. But he admitted that several employees had been asking about medical coverage and that he told them at the meeting that "it was an additional benefit, which was up in the air." Messengers testified that he said he was going to give them medical care and that they had never heard of the other "existing" benefits Cotogno described at the meeting, such as the pension plan and the life insurance plan. In view of this testimony, the ALJ reasonably rejected Cotogno's assertion that he had only described existing benefits and had rejected the possibility of medical benefits.

■ Faced with the employees' testimony, with Cotogno's conflicting testimony, and with the fact that the offer of benefits came at a meeting held to discuss the union and in response to employee questions about what they could expect from the company, the ALJ's and the board's conclusion that Cotogno offered benefits to thwart employee support for the union is fully justified by the record.

### 2. *Threats to Employees.*

Coty challenges the board's findings that Cotogno threatened to discharge an employee for engaging in union activities and to close the company if employees voted for a union and that he engaged in coercive interrogation of the messengers about their union activities. Such conduct, if it occurred, violates § 8(a)(1) of the act. *See, e.g., N.L.R.B. v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 100 (2d Cir.1982) (threatened discharge prohibited); *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 618–20, 89 S.Ct. 1918, 1942–43, 23 L.Ed.2d 547 (1969) (threatened closure prohibited); *Jamaica Towing, Inc.,* 632 F.2d at 212 (threats of closure or loss of employment prohibited); *N.L.R.B. v. Solboro Knitting Mills, Inc.,* 572 F.2d 936, 939–40 (2d Cir.), *cert. denied,* 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978) (coercive interrogation of employees prohibited); *N.L.R.B. v. Gladding Keystone Corp.,* 435 F.2d 129, 132 (2d Cir.1970) (same).

■ The board found that Cotogno threatened messenger Rodriguez by telling him that his job depended on refraining from joining the union. In view of the conflicting nature of the testimony by Rodriguez, who first said that Cotogno told him he could have his job back if he did not join the union, and then later said Cotogno told him that he would be fired from his job if he joined the union, the dissenting member of the panel disagreed with this finding. But the ALJ had specifically recognized the conflict in the testimony and found that "[w]hat emerges from Rodriguez' testimony is that at some point during the course of his employment * * * Cotogno * * * told Rodriguez that his job depended on his refraining from joining the Union." Since this credibility assessment by the ALJ, which was accepted by a majority of the board, is not "hopelessly incredible", *American Geri-Care, Inc.,* 697 F.2d at 60, we have no reason to disturb it.

■ Coty hardly addresses the ALJ's conclusion that Cotogno threatened to close the company if a union were voted in, except for a general denial that it committed any unfair labor practice and an assertion that two witnesses indicated that Cotogno had never made any such threat. The fact that Cotogno never made such a threat to two employees, however, does not mean that he did not make it to other employees. In any case, the testimony of numerous employees to the effect that Cotogno had made such statements is sufficient to support the ALJ's determination.

■ The record also supports the ALJ's conclusion that Cotogno illegally interrogated employees about their union activities. Although the dissenting member of the board panel would not have found the "innocuous questioning" of Caravello about the origin of union flyers in the company office to constitute a violation of the act, he did agree with the panel's overall conclusion that Cotogno had illegally interrogated employees on other occasions. For example, messenger Edward Blunnie testified that Cotogno asked Blunnie whether he

had signed a union card and whether he was "for it".

While the type of questioning directed to Caravello and Blunnie might not always constitute coercive and unlawful questioning, the facts that these questions were put by a high official in the company and were asked in his office, that the information sought provided a basis for taking action against the employees if they admitted to union involvement, and that the employer failed to give any assurance against reprisals when asking the questions, all support the ALJ's conclusion that the questions constituted unlawful, coercive questioning. *Gladding Keystone Corp.*, 435 F.2d at 132; *N.L.R.B. v. Scoler's, Inc.*, 466 F.2d 1289, 1291 (2d Cir.1972). This conclusion is buttressed by the fact that neither employee apparently considered the questions innocuous—Caravello lied as to his knowledge about the pamphlets and Blunnie returned to Cotogno's office the day after the questioning to inform Cotogno that he was getting out of the union. *Gladding Keystone Corp.*, 435 F.2d at 132; *Scoler's, Inc.*, 466 F.2d at 1291.

In short, the record provides ample support for all of the board's conclusions that Coty had unlawfully threatened employees.

### 3. *The N.L.R.B. Subpoena.*

▮▮▮ An employer violates § 8(a)(1) of the act if he tries to influence an employee to ignore a validly served board subpoena to appear at an unfair labor practices hearing. *See e.g., Bryant Chucking Grinder Co. v. N.L.R.B.*, 389 F.2d 565, 567 (2d Cir. 1967), *cert. denied*, 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 (1968). Coty contends that Cotogno did not encourage or influence Blunnie to ignore the subpoena, and that in any case, the exertion of such influence could not have constituted an unfair practice since Blunnie was not an employee at the time.

First, the ALJ specifically credited Blunnie's testimony that Cotogno had told him not to go to the hearing. We simply note that this assessment of credibility is not hopelessly incredible. Second, although the board has cited no case finding a § 8(a)(1) violation based on the exertion of such influence on a *former* employee, we see no reason why such conduct should not constitute a violation here. Influencing a former employee to ignore such a subpoena unjustifiably obstructs the board's investigative process, *Bryant Chucking Grinder Co.*, 389 F.2d at 567, and thereby directly infringes upon the right of current employees to have their rights vindicated by an effective enforcement process before the board. *See N.L.R.B. v. Southland Paint Co.*, 394 F.2d 717, 720–21 (5th Cir.1968). Moreover, although Blunnie was not employed by the company at the time the statements were made, he had a history of leaving the job and later seeking reemployment. Since his ability to regain his job would depend on remaining in Cotogno's good graces, any friendly encouragement to ignore the subpoena might very well have had the same coercive effect that such a statement would have had on a current employee. Given these factors, the board had substantial evidence to conclude that Cotogno's statements to Blunnie violated § 8(a)(1).

### 4. *Caravello's Termination.*

▮▮▮ Firing an employee for engaging in union activities violates both § 8(a)(1) and § 8(a)(3) of the act. *See, e.g., N.L.R.B. v. Advanced Business Forms Corp.*, 474 F.2d 457, 463 (2d Cir.1973). Coty contends that it fired Caravello solely because of his poor attendance record and not because of his union activities. In determining whether the firing was unlawfully motivated, the board may weigh factors such as the employer's anti-union animus, *see N.L.R.B. v. George J. Roberts & Sons, Inc.*, 451 F.2d 941, 946 (2d Cir.1971), disparate treatment of the discharged employee compared to other employees, *cf. Gladding Keystone Corp.*, 435 F.2d at 131, and the employer's reliance on pretextual reasons to justify the discharge, *see American Geri-Care, Inc.*, 697 F.2d at 62–63. The interrogation of employees about union activities, the threats to close the company if a union

were voted in, the extra benefits promised in an attempt to stave off the union, and the threats to fire another employee for his union support, provide substantial evidence of Cotogno's anti-union animus. Company records established that other employees with worse attendance records were not terminated. Finally, Cotogno's varying explanations for the firing—that Caravello failed to come to work on rainy days, that he failed to come to work on Thursdays, that he was excessively absent in general, and that he had violated a specific commitment to come to work on all rainy days—suggest that the reasons were all pretextual. Viewed together, these factors amply support the ALJ's finding that Cotogno fired Caravello because of his union activities.

In short, there was substantial evidence in the record before the ALJ to justify the board's conclusion that Coty had engaged in the specified unfair labor practices.

### B. *The Bargaining Order.*

Coty argues that even if it did commit the alleged unfair labor practices, a bargaining order is not warranted under the circumstances. We have held on numerous occasions that a bargaining order is an extraordinary and drastic remedy, is not favored, and should only be applied in unusual cases. *See, e.g., N.L.R.B. v. Pace Oldsmobile, Inc.,* 739 F.2d 108, 110 (2d Cir.1984); *Grandee Beer Distributors, Inc. v. N.L.R.B.,* 630 F.2d 928, 934 (2d Cir.1980). "The clearly preferred remedy for violation of the Act is an election." *N.L.R.B. v. Marion Rohr Corp.,* 714 F.2d 228, 230 (2d Cir.1983). "This preference reflects the important policy that employees not have union representation forced upon them when, by exercise of their free will, they might choose otherwise." *Id.*

In *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court approved the imposition of bargaining orders in two categories of cases involving employer violations. In the first category, " 'exceptional' cases marked by 'outrageous' and 'perva-

sive' unfair labor practices", a bargaining order is warranted without further inquiry since the coercive effects of the employer's misbehavior cannot be eliminated by the application of traditional remedies. *Id.* at 613–14, 89 S.Ct. at 1939–40 (*quoting N.L.R.B. v. S.S. Logan Packing Co.,* 386 F.2d 562, 570 (4th Cir.1967)). In the second category, "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes", the board might properly take into account "the extensiveness of an employer's unfair practices * * * and the likelihood of their recurrence in the future" before issuing a bargaining order. *Id.* 395 U.S. at 614, 89 S.Ct. at 1940. "If the board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue * * *." *Id.* at 614–15, 89 S.Ct. at 1940–41.

 Although the ALJ did not explicitly indicate in which category he placed Coty's violations, the board found that they fell in "at least the second category." The board does not argue on appeal that the violations also fall in the first category, and we decline to place them there. We do not mean to underplay the serious nature of the charges, since some of the practices, such as threats to close the plant and to discharge union adherents, promises of additional benefits, and the actual discharge of Caravello, are highly coercive and therefore constitute "hallmark" violations in the terminology of this circuit. *See N.L.R.B. v. Jamaica Towing, Inc.,* 632 F.2d 208, 212–13 (2d Cir.1980). Nevertheless, the presence of hallmark violations does not automatically call for a bargaining order. *N.L.R.B. v. Pace Oldsmobile, Inc.,* 739 F.2d 108, 110 (2d Cir.1984). Our preference is always that the union representative be chosen in a free election. Therefore, the board must still analyze the nature of the

misconduct and the surrounding and succeeding events in each case in an effort to assess the potential for a free and uncoerced election under current conditions. *Id.* The issuance of a bargaining order is proper only if, after reviewing all relevant circumstances, including the nature of the employer's misbehavior and any later events bearing on its impact on the employees, the board may reasonably conclude that the employees will be unable to exercise a free choice in an election. *J.J. Newberry Co. v. N.L.R.B.,* 645 F.2d 148, 153 (2d Cir.1981). In a case where, as here, one of the board members has dissented from the issuance of the bargaining order, "it is especially important that the other two panel members carefully articulate the reasons why they believe a fair election cannot be held." *N.L.R.B. v. Marion Rohr Corp.,* 714 F.2d 228, 231 (2d Cir.1983).

In determining that the circumstances here warranted a bargaining order, the ALJ did little more than list the unfair practices and conclude that the "pervasive coercive effect of these violations of the Act is such that an election free of coercion is highly unlikely." In the past we have held that such a listing of unfair labor practices, accompanied by a conclusory statement that a fair election is not possible, does not satisfy the need to analyze attendant circumstances. *Id.* Apparently heeding this prod, the board went a step further than the ALJ and stated that these violations were "likely to have a lasting inhibitive effect on a significant portion of the work force," and that in view of the high-level management source of the threats and the small size of the work force, a fair election was "doubtful, if not impossible."

But, however admirable this stab at analysis might be, the board has again ignored our consistent holdings that "events subsequent to the employer's violations, such as the passage of time and the substantial turnover of employees, are relevant and important factors which should be considered" in determining whether a fair election is possible. *Marion Rohr Corp.,* 714 F.2d at 231. Despite the fact that Coty

argued before the board that nineteen of its thirty-one employees—over 60 percent—left between the time it began its unfair practices and the hearing before the ALJ in July 1982, the board found that no factors mitigated the effect of the unfair practices. In previous cases, we have faulted the board for failing to provide a reasoned analysis of the mitigating impact of much lower turnover rates. *See, e.g., id.* (35%); *N.L.R.B. v. Jamaica Towing, Inc.,* 632 F.2d 208, 216 (2d Cir.1980) (37.5%).

The only grudging recognition that employee turnover might be considered a factor in a proper analysis comes in a footnote—apparently reflecting the views of only one member of the panel—that begins by noting that the member does not necessarily agree with the second circuit's position that employee turnover is a relevant consideration. Even assuming its relevance, he continues, a bargaining order should still issue here since these were "hallmark" violations with a lasting inhibitive effect, and since the nineteen employees had left before the unfair labor practices ended, the last of which apparently occurred in July 1982. We state once again that hallmark violations do not permit issuance of a bargaining order automatically. Simply adding a conclusory statement that the hallmark violations are likely to have a "lasting inhibitive effect" does not satisfy the board's obligation to analyze whether such an effect is actually present here and how it will prevent a fair election. Moreover, lacking evidence of any connection between the unfair practices and the turnover, we do not see how it makes any difference that the turnover occurred during the time of the unfair practices. Even assuming it did make some difference, the turnover here has apparently continued after the termination of the unfair labor practices. Although it is unclear how many former employees were still employed by Coty at the time the ALJ issued his decision in July 1983, ten months after the hearing was closed, or how many were still employed over a year later, in September 1984, when the board issued its decision,

Coty asserts that as of the date of the submission of its appellate brief, ninety percent of the original employees had left.

Again we must fault the board for failing to undertake the proper analysis and instead indulging in its "well-established preference for issuing a bargaining order." *Marion Rohr Corp.*, 714 F.2d at 231. By now, it should be perfectly clear to the board that it must "show that the bargaining order is appropriate when it is issued, not at some earlier date". *Id.; N.L.R.B. v. Knogo Corp.*, 727 F.2d 55, 60 (2d Cir.1984); *N.L.R.B. v. Heads & Threads Co., a Division of MSL Industries, Inc.*, 724 F.2d 282, 289 (2d Cir.1983). This it has failed to do.

We recognize that certain businesses experience substantial employee turnover and that the board must guard against rewarding an employer for his own misconduct or delaying tactics. *N.L.R.B. v. Windsor Industries, Inc.*, 730 F.2d 860, 867 (2d Cir. 1984). But here, at least a substantial portion of the delay in enforcement is attributable to the ALJ and the board. *See Knogo Corp.*, 727 F.2d at 60. Further, where possibly only ten percent of the original employees are still employed by Coty, the effect of the board's bargaining order might well be to impose upon current employees a union not desired by a majority of them. *Id.* If an election would reflect the genuine sentiment of the employees— and the board has given us no reason to believe this is not the case—then to hold an election does not reward employers, but instead effectuates employee rights. *N.L. R.B. v. Jamaica Towing, Inc.*, 632 F.2d 208, 214 (2d Cir.1980).

▇ Although we have the power to remand this matter to the board in the hope of receiving some type of reasoned analysis of the impact employee turnover would have on the chances for a fair election, we are not required to do so. *Marion Rohr Corp.*, 714 F.2d at 231–32. Four years have passed since the charges were filed against Coty, and more than two and one-half years have elapsed since the hearings on those charges closed. In view of the board's repeated failure to provide the type of analysis we have repeatedly requested, we decline to remand this bargaining order for further consideration.

Accordingly, that portion of the order directing Coty to bargain with the union is vacated and enforcement thereof is denied. In all other respects, enforcement is granted.