**TIMSCO INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 86–1351.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1987.

Decided June 2, 1987.

Steven R. Semler, Washington, D.C., for petitioner.

Abby Propsis Simms, Atty., N.L.R.B., Washington, D.C., with whom Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Helen L. Morgan, Atty., N.L.R.B., were on brief, for respondent.

Before MIKVA, STARR, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Petitioner Timsco Inc. (the Company) challenges a decision and order of the National Labor Relations Board (the Board) which found unlawful the Company's refusal to bargain with a certified union. The Union was certified after it won the second of two secret ballot representation elections. The Board set aside the first election, which the Union lost, because it found that the Company had conducted seven coercive interrogations of employees during the election campaign. The Company urges that this action by the Board was unreasonable and that therefore the Union was not properly certified. We reject the Company's arguments and conclude that the Board acted reasonably in finding that the seven exchanges upset the "laboratory conditions" that are supposed to prevail when employees vote on the question of union representation.

## I. Factual and Procedural Background

Timsco is a company engaged in the manufacture, nonretail sale, and distribution of screen printing products in Washington, D.C. On October 25, 1984 the Graphic Communications International Union Local 285, AFL–CIO (the Union) filed a petition with the Board seeking a representation election among the Company's production and maintenance employees. The Board conducted a secret ballot election on De-

cember 7, 1984 which resulted in a tie vote of 11–11 with no challenged ballots. Because it failed to obtain a majority of the votes, the Union lost its bid for representation. On December 14, 1984 the Union filed eighteen specific objections to the Company's preelection conduct. On January 18, 1985 the Board's Regional Director for Region 5 issued a report approving the Union's withdrawal of some of its objections and directing a hearing on several others.

A Board Hearing Officer held a hearing on January 28 and February 12, 1985 and issued his Report on Objections on March 19, 1985. The Report recommended that several of the Union's objections be sustained and that the December 7 election be set aside and a new election held. The Company filed timely objections to the Report and the Union filed an answering brief. On July 26, 1985 the Board issued a decision which purported to adopt generally the Hearing Officer's findings and recommendations, but relied solely on one objection—Objection 6, which charged that the Company had coercively interrogated its employees during the election campaign. The Board found it unnecessary to pass on the other objections that the Hearing Officer recommended it sustain.

Pursuant to the Board's order, the Regional Director held a second secret ballot election on August 23, 1985. This time the Union won by a vote of 11–6 with no challenged ballots. On September 4 the Union was certified as the exclusive bargaining representative of the Company's employees. By letter dated September 6, 1985 the Union requested that the Company bargain collectively. Since September 10 the Company has refused on the ground that the Union was not properly certified because the first election was incorrectly set aside. Moreover, since September 16, 1985 the Company has refused the Union's written requests to bargain over the specific issue of the discharge of probationary employee Louise Robinson. In addition to insisting that the Union was not properly certified, the Company maintains that because its *decision* to discharge Robinson was made on August 27, after the Union won the second election but *before* the Union was certified, it has no duty to bargain over the discharge. The Union argues both that *notice* to Robinson of her discharge took place after certification and that in any event the Company's duty to bargain runs from election rather than certification.

On September 12, 1985 the Union filed an unfair labor practice charge against the Company, which it amended on September 26. On October 24, 1985 the General Counsel issued a complaint against the Company charging that its refusal to bargain with the Union generally and over Robinson's discharge violated § 8(a)(5) and (1) of the National Labor Relations Act. These provisions make it unlawful for an employer "to refuse to bargain collectively with the representative of his employees" or to "interfere with, restrain, or coerce employees in the exercise of [their] rights [under the Act]." 29 U.S.C. § 158(a)(5) and (1). The Company answered the complaint, admitting its refusal to bargain but denying that the refusal was unlawful. On January 10, 1986 the General Counsel filed a motion for summary judgment alleging that all issues raised by the Company were or could have been raised, litigated, and decided in the underlying representation proceeding and that no newly discovered, previously unavailable evidence or special circumstances warranted relitigation. The Company responded that summary judgment was inappropriate because the certification had been improper and because there was a dispute about material facts regarding the Company's duty to bargain over Robinson's discharge. On May 27, 1986 the Board granted the General Counsel's motion for summary judgment and ordered the Company to cease and desist from unlawful conduct and to bargain with the Union generally and over Robinson's discharge. The Company now petitions this court to deny enforcement of the Board's decision and order.

## II. THE APPROPRIATE STANDARD OF JUDICIAL REVIEW

The Supreme Court repeatedly has noted the "wide degree of discretion" af-

forded the Board by Congress in matters concerning the conduct of representation elections. *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946) (citing *Southern S.S. Co. v. NLRB*, 316 U.S. 31, 37, 62 S.Ct. 886, 889, 86 L.Ed. 1246 (1942); *NLRB v. Waterman S.S. Co.*, 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704 (1940); *NLRB v. Falk Corp.*, 308 U.S. 453, 458, 60 S.Ct. 307, 310, 84 L.Ed. 396 (1940)). In its discussion of the impact of the Taft-Hartley Act of 1947 on the scope of judicial review of Board decisions, the Supreme Court reaffirmed its vision of the NLRB as an agency "equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). This court more recently has addressed the specific degree of deference due the Board's decision to hold a rerun certification election. *See Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559 (D.C. Cir.1984). The court noted that the Board and the Hearing Officer are much closer to the facts that underlie any charge of coercion and recognized that the Board's expertise in evaluating workplace atmosphere make it more qualified than a court to maximize employee free choice. *Id.* at 1562–63. The court concluded:

> [T]he scope of our review of the Board's decisions in cases involving certification is extremely limited. If the Board has followed appropriate and fair procedures, and if the Board has reached a rational conclusion concerning whether the atmosphere surrounding the election so attenuated free choice that a rerun election was necessary, we will not presume ourselves—occupying a vantage point remote in time and place from the election at issue—to be better able than the Board to assess the impact of alleged instances of misconduct on an election.

*Id.* at 1564 (citations omitted). It is this "extremely limited" scope of review that we apply to the Board's decision in this case to hold a rerun election.

## III. THE BOARD'S INITIAL ORDER FOR A SECOND ELECTION

The central issue in this case is the appropriateness of the Board's order in July 1985 setting aside the tie-vote secret ballot election held in December 1984 on the basis of coercive interrogation of employees by their employer. If the Board acted reasonably in ordering a new election, the Company has a duty to bargain with the duly certified union. In order to evaluate the reasonableness of the Board's action, we must consider the findings upon which it was based, which are not in dispute among the parties. The Hearing Officer found and the Board adopted his findings that the following chronologically ordered conversations occurred:

1) On November 10, 1984, during the election campaign, Keith Pritchard, Timsco's general manager and the son of its president, approached John Marhefka, a maintenance employee, and asked, "What's going on?" Marhefka responded, "What?" K. Pritchard then said to him, "You know, who's ever behind this organizing is going to screw up a lot of jobs for a lot of people."

2) On November 20, 1984 Marhefka approached K. Pritchard outside of K. Pritchard's office to discuss an anticipated leave of absence. Marhefka followed K. Pritchard into his office, and following the discussion about the leave of absence, K. Pritchard said, "Since you asked me a question, I would like to ask you a question. I know the Union is well organized and they have told you not to say anything. I would like to know why the people want to start a union. We pay them a good wage." Pritchard prefaced this portion of the conversation by asking Marhefka to keep it "in confidence"; Marhefka agreed.

3) During the week of November 23–30, K. Pritchard approached Marhefka at his work area and asked, "What do these people want? Is it money?" Marhefka responded, "What I would like to have is hospitalization." K. Pritchard replied, "If

you wanted this, why didn't you come to me when you had your evaluation and ask for it? Like Vince, because Vince came to me and—during review time and wasn't satisfied, and he was given an increase."

4) During the week of December 3, 1984 K. Pritchard and Marhefka had an exchange about whether the Union would challenge the vote of maintenance employee David Ehrenfried at the scheduled election. K. Pritchard said, "I heard that they are going to challenge Dave's vote." Marhefka responded, "I don't know." K. Pritchard then asked, "You know, what grounds do they have to challenge Dave's vote?" Marhefka responded, "I think Dave can vote." K. Pritchard then asked, "Would you hate Dave if he voted no [against representation]?" Marhefka responded, "No, * * *."

5) On December 6, 1984 Walter Pritchard, Keith's father and president of Timsco, approached Marhefka and asked, "Weren't you a union member?" W. Pritchard also asked where Marhefka had been employed and what union he had belonged to. Marhefka responded that while employed at U.S. Steel's Clairton Works he had been a member of the United Steelworkers of America. W. Pritchard told Marhefka that he didn't think that the Union was good for the Company and that he would like Marhefka's support.

6) On December 6, 1984 W. Pritchard approached Dorothea Green, a graphic artist for the company, and said, "I understand that you are active in organizing getting the Union in." Green responded, "You mean, you're discounting my vote." W. Pritchard told her that he was disappointed that she felt she had to contact the Union and that he would much rather have her come in to see him, that his door was always open.

7) After lunch on the same day, December 6, 1984, W. Pritchard again approached Green and said to her, "I'm surprised at you Dorothea. How did you come about contacting the Union?" Green responded that she had telephoned the Union after finding it listed in the telephone directory. W. Pritchard told Green that he was sur-

prised that Green had done this and that he didn't think she had it in her.

The Hearing Officer concluded that each of these conversations constituted unlawful interrogation and together justified sustaining the Union's Objection 6 and ordering a new election. The Board agreed, concluding that "because there were numerous occasions of coercive employee interrogations that occurred in a small unit of approximately 22 eligible voters, and because the election resulted in a tie-vote, the cumulative effect of the interrogations amount to sufficient objectionable conduct to interfere with the results of the election." Decision and Direction of Second Election at 2 n. 3, Joint Appendix (JA) 88.

The Company challenges the Board's decision, maintaining both that the incidents themselves cannot be deemed coercive in light of Board and judicial precedent and that the Board offered no rationale for its decision. We find that Board and judicial precedent give the Board wide latitude in making determinations of "coerciveness" in questioning and that the Board's decision in this case falls well within those ample boundaries. Moreover, while we acknowledge that the Board's opinion was certainly less than a model of clarity, the Company is incorrect in charging that the Board offered "no rationale" for its decision. We thus reject the Company's challenge to the Board's decision to hold a rerun election.

A. *The "Coerciveness" of the Questioning*

All recent significant precedent on coercive questioning begins with a discussion of *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964), which articulated criteria for assessing the legality of employer questioning under the National Labor Relations Act. The *"Bourne* standards" require that we consider:

(1) The background, i.e. is there a history of employer hostility and discrimination?

(2) The nature of the information sought * * *.

(3) The identity of the questioner, i.e. how high was he in the company hierarchy?

(4) Place and method of interrogation * * *.

(5) Truthfulness of the reply.

*Id.* at 48. In 1980 the Board briefly stepped away from the *Bourne* standards to create a *per se* rule that declared all questioning by an employer about an employee's union sympathies to be inherently coercive. *See PPG Industries*, 251 NLRB 1156 (1980). But the Board overturned *PPG* in its recent decision in *Rossmore House*, 269 NLRB 1176 (1984), embracing instead a flexible "totality of the circumstances" test and citing *Bourne* for relevant areas of inquiry. *Id.* at 1178 & n. 20. The Ninth Circuit affirmed, finding the Board's "totality of the circumstances" test consistent with the NLRA. *See Hotel Employees & Restaurant Employees Union v. NLRB*, 760 F.2d 1006 (9th Cir.1985). The flexibility and deliberately broad focus of this test make clear that the *Bourne* criteria are not prerequisites to a finding of coercive questioning, but rather useful indicia that serve as a starting point for assessing the "totality of the circumstances." We must therefore consider whether the Board's decision was reasonable in light of this flexible standard. We conclude that it was.

The Board clearly acted reasonably in deeming coercive the first conversation between K. Pritchard and Marhefka, in which K. Pritchard said that the union organizers were "going to screw up a lot of jobs for a lot of people." The Hearing Officer found this statement to be a threat, all the more effective because directed at an employee who was not an open and active union supporter. *See* Hearing Officer's Report at 29, JA 69 (citing *Rossmore House*, 269 NLRB 1176 (1984) (deeming interrogation of open and active union supporters less coercive than interrogation of uncommitted employees)). The Company argues in its brief that this statement is no more threatening than one found lawful by the Board in *Phoenix Glove Co.*, 268 NLRB 680 (1984), to the effect that "we did not need a union, that we would be messing up if we

got one." *Id.* at 684. On its face, however, the *Phoenix Glove* statement is a good deal more vague than the statement at issue in this case and more easily understood as simply a prediction that the union would not be a good thing than as a threat that the employer would take some retaliatory action against unionized employees. More significantly, the line between prediction and threat is a thin one, and in the field of labor relations that line is to be determined by context and the expertise of the Board. Given the context here (small workplace, interrogator was general manager, employee was maintenance worker and not active union supporter), we accept the Board's conclusion that Marhefka was threatened in this first conversation.

This threat impacts the next three conversations between Marhefka and K. Pritchard. Repeated questioning about union sympathies in light of the early threat of jobs being "screwed up" can reasonably be deemed coercive even if any *single* exchange, taken out of context, could not itself support a finding of coercion. Moreover, the exchanges between Marhefka and K. Pritchard exhibited many of the characteristics earmarked as coercive by *Bourne*. For example, the November 20 conversation took place in K. Pritchard's office, where Pritchard extracted a promise of confidentiality from Marhefka. *Bourne* identified the importance of the place of interrogation, and clearly the employer's office is "the locus of authority." *NLRB v. Knogo Corp.*, 727 F.2d 55, 58 (2d Cir.1984). The promise of confidentiality extracted by Pritchard, the Board could reasonably conclude, added to the coerciveness of the closed-door chat by increasing Marhefka's isolation in the face of managerial pressure. In addition, K. Pritchard sought information from Marhefka about the Union's plans to challenge another employee's vote. In light of the circumstances, the Board could reasonably conclude that the questions were motivated by the purpose—improper under *Bourne*—to elicit specific information concerning union strategy so

that the Company could better plan its own antiunion strategy.

The last three incidents of questioning involved W. Pritchard, the president of Timsco, and his involvement by itself has a coercive air under the *Bourne* standards because he is the highest ranking officer in the Company hierarchy. Although the smallness of the unit in this case might suggest that a conversation with the president is not a particularly unusual or intimidating event, the record reveals that the president's previous contacts with employees were limited to conversations about the weather. *See* Proceedings Before Hearing Officer at 246, JA 306. The impact of the president's involvement was heightened by the fact that he began his questioning on the day immediately preceding the election, approaching employees a total of three times that day. The president first questioned Marhefka about his past union membership. The Company insists that this line of questioning is lawful in light of the recent Board decision in *Michael's Markets*, 274 NLRB 826 (1985). But in that case the employer's management consultant asked for a show of hands of former union members at a large meeting in an attempt to persuade the employees that union representation provides no guarantee of job security. The Board concluded that this particular request "was not aimed at determining how many employees supported the Union" and thus was not coercive. *Id.* at 828. But in the instant case, the Board could reasonably conclude that a private interrogation by the president of the company of an employee who was not an open union supporter in the context of prior questionings and a threat from the general manager is another thing entirely.

Similarly, the exchanges between the president and Dorothea Green about her role in the union organizing campaign could reasonably be understood as coercive in light of the rank of the interrogator, the fact that Green's support of the Union was not openly acknowledged at the workplace, and the timing of the questioning (twice the same day on the day before the election). These particular factors distinguish these exchanges from those in other cases

that the Company cites. *See J. J. Newberry, Inc. v. NLRB*, 442 F.2d 897 (2d Cir. 1971) (single incident, not on eve of election); *NLRB v. Welsh Industries, Inc.*, 385 F.2d 538 (6th Cir.1967) (single incident, early in union campaign). In light of these factors, the Board's finding of coercion is reasonable.

■ We grant that with the exception of the first threatening conversation between Marhefka and K. Pritchard, none of the exchanges, taken individually and out of context, sounds especially coercive on its face. But it is the Board's job, not ours, to assess the cumulative effect of the seven exchanges—the "totality of the circumstances." Our task is not to reassess independently the coerciveness of the questions, but rather to assess the reasonableness of the Board's conclusion. We are not at liberty to "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465. Given that the voting pool was so small (22 voters) and the vote so close (tied), *any* coercion resulting from the questioning would be strongly felt throughout the voting pool and easily could have affected the outcome of the first election. We find reasonable the Board's conclusion that the questioning was coercive enough to disrupt laboratory conditions so as to require a rerun election.

### B. *The Adequacy of the Board's Rationale*

■ The Company argues in the alternative that the Board's decision should be remanded, rather than denied enforcement, because the Board did not provide a reviewable rationale for its finding of coercion. The Company points out that the Hearing Officer's finding of coercive questioning relied in part on his finding that both Marhefka and Green were victims of other independently objectionable conduct. The Company then argues that because the Board "rejected" this part of the Hearing Officer's reasoning, the Board was left

with no rationale to support its adoption of the Hearing Officer's finding of coercion.

This argument fails for two reasons. First, the Hearing Officer's reasoning relied on *numerous* factors, which include the cumulative effect of repeated questioning in light of an early threat to Marhefka, the closeness of the vote, the small size of the unit, and the proximity of the questioning to the election. It is true that the Hearing Officer *also* listed as a factor his finding that both Marhefka and Green suffered other objectionable conduct. But that "other" objectionable conduct included other incidents of coercive questioning. So the role of incidents aside from coercive questioning played only a small part in the Hearing Officer's finding of coercion. Moreover, the Board did *not* "reject" the Hearing Officer's other findings of improper conduct, as the Company argues. Rather, the Board found that it was "unnecessary" to reach those issues. Apparently, the Board was satisfied with the Hearing Officer's finding of coercion even without reference to *other* coercive acts. Indeed, the Board, in explaining its adoption of the Hearing Officer's recommendations, listed exactly the same factors offered by the Hearing Officer: the number of interrogations, the closeness of the vote, and the smallness of the unit.

We recognize that the Board listed these factors only in a footnote in its order and without further elaboration. Certainly the Board's opinion could have been clearer about the basis for its conclusion. Indeed, the Company would not have been able even to advance its alternative argument attacking the Board's rationale if the Board had adhered to basic canons of opinion writing and included its reasoning in the text of its order. The Board would increase the likelihood that its orders would be enforced and ease the burden on reviewing courts if it were to dedicate a few more lines of text to explaining its reasoning. Nonetheless, although we feel bound to remark the lack of elaboration in the Board's opinion, we cannot agree with the Company that the Board "stated no rationale or analysis to support" its conclusion about coercive questioning. The Board's reasoning, although not presented with admirable clarity, was nonetheless adequate to justify its conclusion.

## IV. THE DUTY TO BARGAIN OVER ROBINSON'S DISCHARGE

The Company contends that even if it has a duty to bargain with the certified union, that duty does not extend to the Union's grievance over the discharge of probationary employee Louise Robinson because the *decision* to discharge her was made before the Union was duly certified, although after it won the second election. The Company maintains that the Board has traditionally administered the statute so as to trigger a bargaining obligation upon certification, although it cites no authority for that proposition. The Company's failure to support the existence of this "tradition" is compounded by the existence of extensive Board precedent suggesting that the duty to bargain often runs from the date of election rather than certification. *See, e.g., Celotex Corp.,* 259 NLRB 1186, 1193 (1982); *St. Elizabeth Community Hospital,* 240 NLRB 937, 939 (1979); *Mike O'Connor Chevrolet-Buick-GMC Co., Inc.,* 209 NLRB 701, 703 (1974), *enforcement denied on other grounds,* 512 F.2d 684 (8th Cir.1975).

 We need not decide, however, whether the instant case falls within the holdings of the precedent cited above or within the elusive "tradition" described by the Company, because the event about which the Union seeks to bargain—Robinson's discharge—occurred *after* the Union was duly certified. The Company concedes that it did not notify Robinson of her discharge until after the Union was certified. It argues, rather, that because the decision to discharge her was made before certification, that discharge does not fall within the scope of its duty to bargain with the Union. We cannot agree. A commonsense understanding of when a discharge "happens" suggests that notice to the discharged employee is the operative event. Moreover, the Board itself chose the date of notice (rather than the date of decision) as the

date of discharge in *Mt. Carmel Hospital,* 255 NLRB 833, 833 n. 1 (1981). We thus conclude that Robinson's discharge occurred post-certification and that the Company therefore is obliged to bargain with the certified union on this issue.

Finally, the Company halfheartedly argues that summary judgment against it is inappropriate because a factual issue remains regarding its duty to bargain over Robinson's discharge. The Company notes, and the Union does not refute, that Robinson failed to speak to the Union or attempt to enlist its aid regarding her discharge. But this factual issue—whether Robinson desired Union help—is not relevant to the existence of the Company's duty to bargain. It is difficult to imagine why the Union would want to bargain over a discharge not objectionable to the discharged employee or what remedy it could possibly seek if the employee truly did not desire reinstatement. That conundrum, however, has no bearing on the Company's duty under the Act to bargain in good faith with the certified union with respect to the "terms and conditions of employment" of any employee in the bargaining unit. *See* 29 U.S.C. § 158(d) (1982).

### V. Conclusion

Long ago, the courts acknowledged the special expertise of the Labor Board in seeking to protect the delicate fairness of the election place. We uphold the Board's exercise of that expertise in this case. The Board's decision to order a rerun election on the basis of coercive questioning by the Company was reasonable. The Company therefore has a duty to bargain with the union certified after the rerun election. That duty includes bargaining over the post-certification discharge of Louise Robinson. Accordingly, the Company's petition for review is denied, and the Board's cross-application for enforcement is granted in its entirety.

*It is so ordered.*