## J. J. NEWBERRY CO., A Wholly Owned Subsidiary of McCrory Corporation, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 495, 1378, Dockets 80–4157, 80–4205.

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1981.

Decided March 31, 1981.

As Amended May 21, 1981.

---

Jerrold J. Wohlgemuth, Atty., N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Atty., N. L. R. B., Washington, D. C., of counsel), for respondent.

Max Wild, New York City (Michael S. Rabin, Rubin, Baum, Levin, Constant & Friedman, New York City, of counsel), for petitioner.

Before MOORE, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

J.J. Newberry Company ("the employer") proceeding under § 10(f) of the National Labor Relations Act as amended, 29 U.S.C. §§ 151 et seq. ("the Act"), has petitioned for review of a decision and order of the National Labor Relations Board. The Board in turn has filed a cross-application for en-

forcement of its order under § 10(e) of the Act. The Board's decision and order, reported at 249 N.L.R.B. No. 126, found that the employer had committed certain unfair labor practices during the course of an organizational campaign conducted at the employer's Green Acres store in Valley Stream, Long Island, by Local 1102, Retail, Wholesale, Department Store Union, AFL–CIO ("the Union"). The campaign led to a Board-supervised election among the Green Acres store employees, resulting in a 44–44 tie vote. The order requires the employer to cease and desist from the unfair labor practices, to post notices, to make whole all employees who lost earnings as a result of what the Board determined was an unlawful withholding of a planned wage increase and, finally, to recognize and bargain with the Union.

The employer challenges the Board's finding that it committed unfair labor practices. It also contends that the Union's majority showing was tainted by the use of supervisory employees to obtain authorization cards and that a bargaining order is not an appropriate remedy. With the exception of the withholding of the pre-planned wage increase we find the Board's unfair labor practice determinations to be supported by substantial evidence. The cease and desist and notice aspects of the order are therefore enforced to that extent. The requirements that the employer make whole the employees for lost wages and bargain with the Union are, however, improper. The bargaining order is vacated and the case remanded to determine whether a rerun election is appropriate.

The employer operates numerous retail department stores throughout the country. In July of 1977, the Union began an organizing campaign at the employer's Green Acres store. The bargaining unit at the store consisted of about 105 employees and by August 3, 1977, the Union had obtained signed authorization cards from 73 of those employees. On the basis of this showing the Union petitioned for a representation election. Approximately 34 of the 73 cards had been collected by two individuals named Muriel Hirst and Diane Puglia. The

employer, believing these two women to be supervisors, moved on August 12, 1977, to dismiss the election petition on the ground that the Union's showing of interest was tainted by supervisor-participation. This motion was eventually denied by the Regional Director and then by the Board. The election was held on October 28, 1977, with the direction that the votes of Hirst and Puglia be challenged and their supervisory status determined in a post-election hearing if necessary. The result was a 44–44 tie vote.

After the election the Union filed objections and unfair labor practice charges alleging that the employer violated the Act by having *granted* a wage increase some three weeks before the election and by various instances of interrogation, solicitation of grievances and accusations of disloyalty. A hearing was held before an administrative law judge (ALJ) during which the Union's complaint was amended by the Regional Director to add an allegation that the employer had improperly *withheld* a wage increase. The ALJ found that certain conversations which the Green Acres store manager, Mr. Sweetser, and other higher level company officials had had with employees Rosenburg, Caraprese and Hayes violated § 8(a)(1) and that the employer had also violated § 8(a)(1) by unlawfully granting a wage increase prior to the election. However, the ALJ also found that Hirst and Puglia were supervisors, that the withholding of the wage increase had not been unlawful and that a bargaining order was not warranted.

Upon review a three-member panel of the Board agreed with the ALJ as to the minor § 8(a)(1) violations and the unlawful grant of a wage increase. All three members, however, held that the ALJ had erred in finding that Hirst and Puglia were supervisors and that the withholding of the wage increase had been proper. A two-member majority then concluded that a bargaining order was required. Member Penello, agreeing with the ALJ, dissented from this aspect of the Board's ruling.

The wage increase dispute, which is the linchpin of the Board's case, stemmed from a decision made by the employer in July of 1977, *before* the beginning of the Union's organization drive, to raise wages at all Long Island stores. The decision was prompted by an expected rise in the minimum wage (which it had always been the employer's policy to anticipate) and by the fact that the employer had opened a new Long Island store in Holbrook where the company found it necessary to pay higher wages to attract employees, which led employees in other Newberry stores to expect comparable increases. No fixed date for the implementation of the wage increase at the Green Acres store was set, but it was expected to occur during August.

Both sides agree that the decision to increase wages had been made by the company without regard to any union considerations. The controversy revolves around the timing of implementation. The employer, on the advice of counsel, did not grant the increase in August or September, since its motion to dismiss the election petition was pending before the Regional Director. On October 3, 1977, after being informed that the Regional Director had upheld the Union's showing of interest and had directed that an election be held on October 28, 1977, counsel advised management that the wage increase could be implemented at the Green Acres store. On October 6, 1977, Vice-President Elliott visited the Green Acres store and in the context of what the Board and the ALJ describe as an "anti-union" speech, announced the wage increase. The speech itself was not found to be an unfair labor practice.

## DISCUSSION

1. *The Unfair Labor Practices*

■ The Board's finding, in agreement with the ALJ, that management's interrogation and solicitation of employees Rosenburg, Caraprese and Hayes amounted to § 8(a)(1) violations is supported by substantial evidence. However, for reasons noted *infra*, these violations were minor and would in no event support a bargaining

order or an award of back pay. Although the question is a close one, substantial evidence also supports the Board's acceptance of the ALJ's conclusion that the timing of the employer's eventual announcement and grant of the wage increase was a violation of § 8(a)(1), even though the employer's initial decision to raise wages was perfectly legitimate. The Board's conclusion, which disagreed with the ALJ, that the employer's previous withholding of the increase violated §§ 8(a)(1) and (3), however, is not so supported.

Having previously decided to increase wages, the employer in August 1977 was in the position of being forced to tread on eggshells, being caught in a potential "damned if you do, damned if you don't," situation. *NLRB v. Dorn's Transportation Co.*, 405 F.2d 706, 715 (2d Cir. 1969). The predicament is one in which the employer's motives play an important part in judging the legality of its actions.

"Employers, with some justification, have argued that there is a potential for confusion and unfairness in rules that may make it illegal, on the one hand, to withhold and, on the other hand, to grant, a wage increase. But neither course has been declared illegal *per se*. It becomes so only if the employer is found to be manipulating benefits in order to influence his employees' decision during the union's organizing campaign." *NLRB v. Otis Hospital*, 545 F.2d 252, 255 (1st Cir. 1976).

See also, *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124 (9th Cir. 1978); *Dorn's Transportation, supra*, 405 F.2d at 715 ("The issue under the Act is therefore whether in form and in purpose the withholding or conferring of economic benefits was to discourage and frustrate the statutory right of employees freely to organize and bargain collectively.")

In this case, 20–20 hindsight supports the view that because the employer's decision to increase wages was made prior to and independently of any union activity, it could have gone ahead and implemented the raise in the face of the union drive. But if the

employer did so it faced the serious risk, as its attorneys recognized, that an increase in wages so soon after the Union petitioned for an election would lead to an unfair labor practice charge. It seems more than likely that if the employer *had* raised wages in August, the Union would not have conceded that the employer was merely implementing a predetermined, non-discretionary, benefit. Thus, in this context the employer's mere withholding of a raise in the, face of a union campaign does not automatically amount to an unfair labor practice. The purpose and effect of the employer's action must first be ascertained.

The ALJ concluded that the purpose and effect of the withholding were legitimate. He noted first that the employer had relied on the advice of its lawyers and stated, correctly in both respects, that "while it is clear that Respondent is not relieved from any liability on the grounds that it acted pursuant to the advice of counsel, [*NLRB v. Hendel Manufacturing Co., Inc.,* 483 F.2d 350, 353 (2d Cir. 1973)], this is nevertheless a factor to be considered in determining whether Respondent's motivation was unlawful." 249 N.L.R.B. No. 126 at 25. He then went on to observe that the record was "absolutely barren" of any evidence indicating that the decision to increase pay had ever been communicated to the employees prior to its being implemented at the various stores or that the Green Acres employees were ever aware of management's decision to grant and subsequently withhold a pay increase. "Therefore," the ALJ concluded, "it cannot be said that the Respondent made any effort to capitalize on the initial decision to grant or the subsequent decision to withhold the wage increases from Green Acres employees. In these circumstances, it can hardly be said that the Respondent was seeking to interfere with the employees' freedom of choice ... by deciding to withhold the wage increases from the employees. [Citations omitted]." *Id.* at 26.

The Board rejected this approach, concluding instead that

"it is reasonable to presume that Respondent's decision to withhold the August increase at Green Acres was not only likely to become known to the Green Acres employees but also to be understood by such employees as interference with their organizational activities. Thus, the absence of a specific announcement that the increase was being withheld at Green Acres—but being granted at all other Long Island stores operated by Respondent—does not alter the conclusion that Respondent's withholding of the wage increase violated the Act." *Id.* at 7.

The record does not support this presumption. The bulk of the testimony cited by the General Counsel in support of the Board's position reflects only management's knowledge of a general employee awareness that higher wages were being paid at the company's new Holbrook store. It does *not* indicate that the employees knew of the decision to increase their wages or of the subsequent decision to withhold the increases at Green Acres. Only one somewhat confused letter might be construed as supporting the proposition that the employees knew that decisions had been made to grant them increases and then to withhold the raise because of their union activity. As against this confusing letter it appears very probable that if the employees had such knowledge the Union would surely have objected on the ground that a benefit had been unlawfully withheld. But it did not. More important, although the Board's General Counsel called numerous Green Acres employee witnesses, he did not elicit testimony from any of them that they knew during August and September that they were being deprived of a planned increase. On this record the Board's contrary presumption is not supported by substantial evidence.

In light of the undisputed circumstances—the employer's inability to predict with any degree of certainty whether an implementation in August of its previously adopted raise would be viewed by the Board as lawful, its reliance on the good faith advice of counsel, its pains to refrain from

capitalizing on the withholding, and the Union's failure to complain of the withholding—we agree with the ALJ that the withholding did not have an anti-union purpose or effect and was thus not shown to be unlawful.

### 2. *The Bargaining Order*

■ As we have recently reiterated, a rerun election and not a bargaining order is the preferred remedy for employer misconduct which taints a union election. *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212 (2d Cir. 1980). The issuance by the Board of a bargaining order in lieu of a new election is "only proper if, after an objective review of all of the relevant surrounding circumstances, including the nature of the employer's misbehavior and any later events bearing on its impact on the employees, it may reasonably be concluded that the employees will be unable to exercise a free choice in a Board-supervised rerun election." *Id.* We cannot agree with the Board that such a conclusion can reasonably be reached in this case.

■ The employer's initial withholding of the wage increase was not an unfair labor practice. The interrogations of the three employees, though technically § 8(a)(1) violations, were very minor infractions which could never support the issuance of a bargaining order. As Member Penello correctly observed in his dissent, these violations "involved only 3 employees in a unit of about 100, took place over a period of several months, and would not tend to have a lasting effect on the employees." 249 N.L.R.B. No. 126 at 15 n.14. Additionally, there is no evidence that the violations were ever communicated to other employees. Thus, the only employer conduct which could possibly provide a framework for a bargaining order in this case was the employer's implementation of the wage increase. That the Board majority did base its decision primarily on that action is revealed by its statement, "Respondent's grant of a substantial wage increase to all unit employees in violation of Section 8(a)(1) of the Act is sufficient to render it unlikely that a fair election could be held." *Id.* at 8–9.

■ It is true that the improper grant of significant economic benefits to employees is often characterized as a "hallmark" unfair labor practice which will justify a bargaining order in the absence of mitigating circumstances or evidence showing that the conduct is not as serious as it may seem. See, *Jamaica Towing, supra*, 632 F.2d at 212–13. The mere presence of such a violation, however, does not automatically preclude a fair second election or mandate the issuance of a bargaining order. Circumstances may exist where grants of economic benefits, even combined with additional unfair labor practices, are insufficient to support a bargaining order. See, e. g., *First Lakewood Assn. v. NLRB*, 582 F.2d 416 (7th Cir. 1976); *Donn Products, Inc. v. NLRB*, 613 F.2d 162 (6th Cir. 1980). Rather than react in knee jerk fashion to the presence of a hallmark violation, the Board must still analyze the nature of the misconduct and the surrounding and succeeding events in each case in an effort to assess the potential for a free and uncoerced election under current conditions. Undertaking such an analysis here, it is clear that, in the language of *Jamaica Towing*, more than one "significant mitigating circumstance exists," 632 F.2d at 212, both with respect to the violation itself and later events, which render a bargaining order both unnecessary and inappropriate.

In the present case it is undisputed that the employer's decision to raise wages had been made independently of any union considerations and that the earlier withholding was not motivated by anti-union purposes. The normal inference of anti-union animus is difficult to draw from the increase in these circumstances. Nor do they indicate any substantial likelihood that anti-union conduct will be repeated, which is a usual inference from an improper benefit grant. As the ALJ said:

> "Although the granting of the wage increases was found to be unlawful under the circumstances, its history cannot be ignored; i. e., the decision to grant the wage increase was made prior to the advent of the organizing campaign, and the

Respondent withheld the wage increase after the filing of the Union's petition in order to avoid an unfair labor practice charge while contesting the validity of the authorization cards." 249 N.L.R.B. No. 126 at 28.

In addition, the ALJ specifically found that the October decision to go ahead with the increase was premised on an "honest but misconceived judgment of counsel." *Id.*

The undisputed surrounding circumstances here further dispel the notion that the wage increase might have a coercive impact on Green Acres employees or be viewed by them in the future as a deterrent against their embracing the Union. The Green Acres employees, aware that the employer had been required to pay higher wages to those at Holbrook, could hardly have viewed the increase as largesse designed to impress them with their employer's power and thus inhibit the enthusiasm for union representation. On the contrary, they understood when the increase was announced that it had been delayed only by reason of the Board's election proceedings. As Member Penello of the Board observed in his dissent:

"In announcing the raise, Respondent stated that the employees would now receive the increases they deserved. The majority concludes that the employees at the Green Acres store were aware that employees at the other stores had already received raises. Thus, the Green Acres employees would be less likely to see the raise as an inducement to vote against the Union. When informing its employees that the 'logjam' was finally broken, Respondent, in fact, placed the onus for the delay on the Regional Director and the timing of the Decision and Direction of Election rather than blaming employees' union sentiments or activities. While I have no doubt that these actions of Respondent are violations of the Act, they are not of the type to preclude employees' free choice in the election process." *Id.* at 15.

Finally, despite the Board's apparently continuing refusal to consider subsequent events and current conditions in weighing the need for bargaining orders, we hold that both are relevant. *Jamaica Towing, supra,* 632 F.2d at 214–15. In this case there has been a particularly high employee turnover. As of October 6, 1980, only 38 of the 105 employees (or less than 37%) who voted in the original election are still working at Green Acres. The effect of a bargaining order could thus easily be to impose upon the employees a union not desired by the great majority of them. Where, as here, there is no indication that the employer in any way deliberately created delay in order to profit from it and, since the unfair labor practice involved was not egregious in the first place, the risk of this unwanted imposition is unwarranted.

The preferred remedy remains a new election. Only where there is a substantial danger that employees will be inhibited by the employer's conduct from adhering to the union should a bargaining order issue. The Board errs in taking the view that bargaining orders should liberally be granted as remedies despite evidence that a new election would suffice.

3. *The Supervisory Issue*

█ Finally, the Board's finding that Hirst and Puglia were not supervisors, though in contrast to the ALJ's determination, is supported by substantial evidence. The Board's statement that Hirst, "while an experienced and trusted employee, does not possess any indicia of supervisory status," 249 N.L.R.B. No. 126 at 3, and its characterization of Puglia as a "nonsupervisory leadman," *id.* at 5, both appear to be fair interpretations of the facts. The rule with respect to supervisory determinations is that

"the Board's findings in this area are entitled to 'special weight,' *Amalgamated Local Union 355 v. NLRB,* 481 F.2d 996, 999–1000 (2d Cir. 1973), *cert. denied,* 414 U.S. 1002 [94 S.Ct. 357, 38 L.Ed.2d 238] (1973), in light of the Board's expertise 'in evaluating actual power distributions which exist within an enterprise,' *NLRB v. Metropolitan Life Insurance Co.,* 405 F.2d 1169, 1172 (2d Cir. 1968)." *NLRB v. Porta Systems Corp.,* 625 F.2d 399, 401 (2d Cir. 1980).

The employer's claim that the Union's card majority was tainted by supervisory solicitation is accordingly rejected.

### 4. *Relief*

The cease and desist order as it relates to unfair labor practices based on the solicitation and interrogation of employees and grant of benefits is enforced. The bargaining and make-whole orders are vacated and the case is remanded to the Board with directions to determine whether a rerun election is appropriate.