NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SO–LO FOODS, INC., Respondent.

No. 91–1892.

United States Court of Appeals,
Fourth Circuit.

Argued June 1, 1992.

Decided Oct. 30, 1992.

As Amended Jan. 25, 1993.

David A. Fleischer, N.L.R.B., Washington, DC, argued (Jerry M. Hunter, General Counsel, D. Randall Frye, Acting Deputy General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., on brief), for petitioner.

Peter David Guattery, Joseph Kres Pokempner, Whiteford, Taylor & Preston, Bal-

timore, MD, argued (Larry M. Wolf, on brief), for respondent.

Before WILLIAMS, Circuit Judge, BUTZNER, Senior Circuit Judge, and GARBIS, United States District Judge for the District of Maryland, sitting by designation.

## OPINION

GARBIS, District Judge:

The National Labor Relations Board ("the Board") seeks enforcement of its Order directing So–Lo Foods, Inc. (trading as and commonly referred to as Valu Food) ("the Company") to cease and desist from the unfair labor practices the Board found to violate sections 8(a)(1) and 8(a)(5) of the Labor Management Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(5) ("the Act") and from in any other manner interfering with, restraining, or coercing its employees in the exercise of their statutory rights. The Board also found that the employees at the Havre de Grace store were an appropriate bargaining unit, that a majority of the unit employees had signed valid authorization cards designating the Union [1] as their bargaining representative, that the Company's unfair labor practices made a fair election unlikely, and that misconduct by the Union did not justify withholding a bargaining order. Accordingly, the Board further ordered the Company to bargain with the Union at the Havre de Grace store.

The Board now seeks enforcement of its orders. The Company disagrees with the Board's findings, the imposition of a broad remedial cease and desist order, and the issuance of the bargaining order. Reviewing the Board's orders under section 10(e) of the Act, 29 U.S.C. § 160(e), we conclude that there was substantial evidence to support the Board's conclusions that the Company committed unfair labor practices and that the bargaining order is appropriate. Accordingly, we affirm the Board's findings and grant enforcement.

## I.

█ In 1988, the Denrich family owned 13 supermarkets in Maryland and one in Pennsylvania. Louis Denrich is the aggressive President of the Company who is largely responsible for the growth of the Company from a corner grocery owned by Steve Denrich (Louis' father) to a chain which employs approximately 1,000 employees. Valu Food's managerial organization consists of chain-wide and local store management.

Previously, the Union had twice attempted to unionize the Company, but had withdrawn its effort before an election was held. The Board's findings that the Company violated the Act arose from the Union's 1988 attempt to unionize employees at three of the Company's stores.[2]

The violations the Board found the Company had committed at the Havre de Grace store can be placed into the four broad categories of interrogation, surveillance, grants and promises of benefits, and threats of closure and other reprisals. At the Elkton store, the Company required its employees to fill out a questionnaire that the Board found resulted in the unlawful interrogation of employees and implicit promise to rectify their grievances, in violation of the Act.[3]

---

1. United Food and Commercial Workers International Union, Local 27, AFL–CIO–CLC.

2. Two of the locations are Havre de Grace and Elkton. The third location is Stemmers Run Road; however, the Company does not contest the Board's findings of violations at that store.

3. More specifically, the Board found that the Company, at its Havre de Grace store, impliedly threatened to close its stores, asked employees to maintain surveillance of other employees and to report on their union activities, impliedly threatened to discharge the spouse of a prounion employee, coercively interrogated employ-

ees about union activities, impliedly promised to improve working conditions and to give a wage increase, unlawfully gave wage increases to employees, requested an employee to take a position on asking other employees to abandon union support, threatened an employee with loss of friendship, unlawfully required an employee to remain in her department, unlawfully forbad an employee from talking about a union, and engaged in and gave the impression of surveillance of the union activities of its employees.

The Board also found that the Company, at its Stemmers Run Road store, granted and prom-

The Board's findings are entitled to affirmance when supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). The reviewing court is not to substitute its own judgment for that of the Board, even when it might have drawn a different conclusion had it decided the issue *de novo*. *Owens–Corning Fiberglass Corp. v. NLRB*, 407 F.2d 1357, 1360–61 (4th Cir.1969). We have considered the reasons advanced by the Company as to why the Board's findings are not supported by substantial evidence, and find them to be without merit. Because there is substantial evidence in the record as a whole to support each of the Board's findings, we affirm those findings and grant the Board its application for enforcement of its remedial order.[4]

## II.

The Company also challenges the Board's issuance of a bargaining order, requiring the Company to bargain with the Union at its Havre de Grace store. For the reasons discussed below, we find that a bargaining order is appropriate.

## A.

■■■ In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610–16, 89 S.Ct. 1918, 1938–41, 23 L.Ed.2d 547 (1969), the Supreme Court upheld the Board's authority to issue a bargaining order when, after a union achieves an authorization card majority, an employer destroys that majority by engaging in unlawful conduct. The Board may only issue a bargaining order upon finding: (1) that the Union once had a majority status, (2) that such status has been dissipated by pervasive misconduct on the part of the employer, (3) that the possibility of erasing the effects of [these] past [pervasive] practices and of ensuring a fair election [or a fair rerun] by the use of traditional remedies, though present, is slight, and (4) that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order.

*NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988, 996 (4th Cir.1979) (citations omitted). While "an election, not a bargaining order, remains the traditional, as well as preferred, method" for determining the employees' bargaining agent, *id.* at 996, the Board's "choice of remedy must ... be given special respect by reviewing courts" considering the Board's "fund of knowledge and expertise all its own." *Gissel*, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32.

Certain violations, commonly called "hallmark violations," are so coercive that their presence:

will support the issuance of a bargaining order unless some significant mitigating circumstance exists.... In such cases the seriousness of the conduct ... justifies a finding without extensive explication that it is likely to have a lasting inhibitive effect on a substantial percentage of the workforce.... [It] may reasonably be calculated to have a coercive effect on employees and to remain in their memories for a long period.

*NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212–13 (2d Cir.1980); *NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 822–23 (4th Cir.), *cert. denied*, 498 U.S.

---

ised benefits, impliedly threatened to close the store, kept an employee under surveillance, and interrogated an employee about union activities. At the Company's Elkton store, the Board found that the Company coercively interrogated employees and impliedly promised to rectify their grievances.

4. The Company objects to the Board's decision that each remedial order must include broad cease and desist language, specifically, "WE WILL NOT in any other manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act." Broad remedial orders are "warranted only when a respondent is shown to have a proclivity to violate the Act or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *Hickmott Foods, Inc.*, 242 NLRB 1357, 1357 (1979). The Company asserts that the "limited circumstances" of the violations at the three stores do not demonstrate proclivity to violate the Act or a general disregard of it, and thus, the broad cease and desist language should be stricken. Considering the numerous and serious violations, at three different stores, the Company's assertion is without merit.

1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990). Threat of plant closure is a hallmark violation. *Jamaica Towing*, 632 F.2d at 212 & n. 2, 213. Such threats, standing alone, may support a bargaining order. *Gissel*, 395 U.S. at 615, 89 S.Ct. at 1940–41.[5]

In this case, the Company not only committed a hallmark violation by threatening plant closure, but also committed numerous and extensive other violations. The Board determined that the "lingering effects of [the Company's] unfair labor practices" rendered "the likelihood of conducting a fair second election in the foreseeable future so slight that, on balance, it is preferable to rely on the majority employee preference expressed through valid authorization cards." *So–Lo Foods, Inc.*, 303 NLRB No. 116 n. 3 (July 19, 1991). The reasons why the Board reached this conclusion are easily ascertainable from the record, *Impact Industries, Inc. v. NLRB*, 847 F.2d 379, 383 (7th Cir.1988), providing us with sufficient basis to make an informed review of its decision. *NLRB v. Maidsville Coal Co.*, 718 F.2d 658, 660–61 (4th Cir.1983) (en banc), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 761 (1984). The finding of numerous violations committed by the Company clearly supports the issuance of a bargaining order in this case.

### B.

■ The Company suggests that the Havre de Grace store is not an appropriate bargaining unit, but rather that only a single, company-wide unit is appropriate for collective bargaining purposes. The Board denied the Company's attempt to present evidence to that effect because, prior to the Board election, the Company stipulated that the Havre de Grace store was an appropriate unit. The Company asserts that where a stipulation is in contravention of Board policy or statutory proscriptions, or where changed circumstances render the

stipulation no longer appropriate, an employer cannot be bound to those stipulations in a subsequent unfair labor practice proceeding. *NLRB v. KVP Sutherland Paper Co.*, 356 F.2d 671, 674 (6th Cir.1966).

■ A stipulation such as the one at issue is not in contravention of Board policy. The Board's policy is that a "single store in a retail chain ... is *presumptively* an appropriate unit for bargaining." *Haag Drug Co.*, 169 NLRB 877, 877 (1968) (emphasis in original). The Board should permit rescission of a stipulation if "substantial changed circumstances mak[e] the performance under the stipulation unfair or inequitable." *Methodist Home v. NLRB*, 596 F.2d 1173, 1177 (4th Cir.1979). In this case, however, the Board determined that rescission would be improper after considering the fact that the Company was seeking to avoid the bargaining obligation created by its improper conduct on the basis of its own organizational changes. We agree. To decide otherwise would allow the Company to "nullify unfavorable elections simply by modifying the job responsibilities of a particular position." *St. Anthony Hosp. Sys., Inc. v. NLRB*, 884 F.2d 518, 524 (10th Cir.1989).

### C.

■ The Company also contends that the authorization cards used by the Union do not suggest that the Union enjoyed the majority support of Havre de Grace employees because Union organizing leaflets distributed to the employees stated that the only purpose for signing the cards was to secure an election.

In *Gissel*, the Supreme Court found that where an authorization card unambiguously designates a union as the signer's bargaining representative, the card is valid "unless that language is deliberately and clearly canceled by a union adherent with

---

**5.** However, the "mere presence of such a violation ... does not automatically preclude a fair second election or mandate the issuance of a bargaining order." *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 153 (2d Cir.1981). A bargaining order may still be improper if there exist mitigating circumstances "showing that the conduct

is not as serious as it may seem." *Id.* at 153. Accordingly, the Board must analyze the "nature of the misconduct and the surrounding and succeeding events" in each case so as to assess the potential for a free and uncoerced election. *Id.*

words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606–07, 89 S.Ct. at 1936. Every card here stated, "I hereby authorize the [Union] to represent me for the purpose of collective bargaining" immediately above where the employee signed. The leaflets mentioned by the Company described the signing of an authorization card as the first of several "steps to a union contract," not as the Company asserts, that the cards were only to procure an election. The authorization cards are valid and are a reliable indicator that the Union held majority support of the employees.

### D.

■ Seven months after the Board election at the Havre de Grace store, the Union began picketing at various other stores of the Company. At first, for about three months, the picketing related to the labor dispute between the Union and the Company. Starting in January 1989, in addition to its picketing, the Union began to hand-distribute leaflets at the Company's stores and mass-mail leaflets to consumers' homes alleging that Valu Food violated weights-and-measures regulations, and that Valu Food maintained unsanitary conditions. At least one leaflet concerning health code violations was distributed to homes in the general Havre de Grace area (without reference to any labor dispute). During this time, a union organizer told a Company supervisor that "we're going to close your stores." Another organizer told a Valu Food employee that the Union no longer had any interest in organizing Valu Food, and that they just wanted to "put Louis out of business."

The Company asserts that it should not be required to bargain with a Union which has publicly expressed an intention to put it out of business and that given the Union's various actions, it can no longer be assumed that a majority of employees would

still support the Union. The Board rejected the Company's position, and so do we.

■ Where the acts of a union evidence "a total disinterest in enforcing its representation rights through the peaceful legal process provided by the Act," a bargaining order may be withheld. *Laura Modes Co.*, 144 NLRB 1592, 1596 (1963) (union physically assaulted two officers and one employee of the employer). A union should not, however, be punished by withholding a bargaining order absent a "most serious situation[ ]." *Dow Chemical Co.*, 216 NLRB 82, 87 (1975).

Peaceful, and legal, picketing and leafletting is a far cry from the violence in *Laura Modes*, and is not, we believe, a "most serious situation" which would justify our withholding the Board's bargaining order. Additionally, as opposed to the circumstances in *Bausch & Lomb Optical Co.*, 108 NLRB 1555 (1954), cited by the Company in support of its position, the statements by union organizers to the effect that the Union wanted to put the Company out of business was made to a severely limited audience. We find that those statements will not have a significant impact on bargaining.

### III.

■ The Company has submitted a Motion to Supplement Record to include the affidavit of Paul Marsiglia, Director of Personnel for So–Lo Foods. Mr. Marsiglia's affidavit contains information that the complement of employees at the Havre de Grace store has significantly changed (by a 73% turnover) since the 1988 Board-conducted representation election. The Company suggests that this turnover renders the bargaining order inappropriate. We decided to delay ruling on the Company's motion until after oral argument. For the reasons discussed below, we now deny the Company's request.

■ The employee turnover to which the Company points occurred since the Board's decision.[6] Generally speaking, significant employee turnover through normal

---

**6.** Perhaps a small portion of the turnover occurred before the decision. The Company sought to introduce evidence of turnover at the

time of the administrative hearing, but the turnover was so minimal that when the administrative law judge refused to hear the evidence as

attrition may make a bargaining order inappropriate and is relevant to that inquiry. *See, e.g., NLRB v. Apple Tree Chevrolet, Inc.,* 671 F.2d 838, 841–42 (4th Cir.1982); *J.J. Newberry Co. v. NLRB,* 645 F.2d 148, 154 (2d Cir.1981).

Here, we note that the Company has failed to present any information as to whether the very high turnover revealed in Mr. Marsiglia's affidavit was through normal attrition. The lack of any such evidence leads us to speculate that the significant turnover is attributable to management maneuvering from a Company intent on dissipating a pro-union group of employees. While we certainly do not know this to be a fact, we would be remiss in considering such turnover evidence where it is not clearly established that the turnover occurred innocently.

 We will not generally consider evidence of events subsequent to the Board's decision during our review of that decision. *L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1353 (9th Cir.1980); *see also General Steel Products, Inc. v. NLRB,* 445 F.2d 1350, 1357 (4th Cir.1971) (concurring opinion). There comes a time when litigation must come to an end. Our consideration of post-decision events would "put a premium upon continued litigation by the employer" in this type of case. *L'Eggs Products,* 619 F.2d at 1352–53. Particularly in a case like this, consideration of the proffered evidence would promote post-decision employee shuffling to avoid compliance with Board decisions.

## IV.

For the foregoing reasons, the Board's application for enforcement of its Order shall be granted and the Company's Motion to Supplement the Record shall be denied.

*ENFORCEMENT GRANTED; MOTION TO SUPPLEMENT RECORD DENIED.*

not being material, the Company did not object, implicitly agreeing with the administrative law judge. Nor did the Company seek to introduce such evidence to the Board before its decision

was rendered, seemingly because there still hadn't been any significant turnover. The large turnover, therefore, seems to have occurred after the Board's decision.