31 F.3d 79
 146 L.R.R.M. (BNA) 3079, 129 Lab.Cas. P 11,203
 J.L.M., INC., doing business as Sheraton Hotel Waterbury,
Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
Local 217, Hotel and Restaurant Employees' and Bartenders'
Union, AFL-CIO, Intervenor.
 No. 1586, Dockets 93-4226, 93-4238.
 United States Court of Appeals,
Second Circuit.
 Argued April 21, 1994.
Decided August 3, 1994.
 
 Vincent J. Falvo, Jr., N.L.R.B., Washington, DC (Charles Donnelly, Supervisory Atty., Daniel Silverman, Acting Gen. Counsel, Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., of counsel), for petitioner/cross-respondent.
 Edward F. O'Donnell, Jr., Hartford, CT (Dana Shaw Mackinnon, Kenneth R. Plumb, Siegel O'Connor, Schiff & Zangari, P.C., of counsel) for respondent/cross-petitioner.
 Before: MESKILL, ALTIMARI and McLAUGHLIN, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 J.L.M. Inc., d/b/a/ Sheraton Hotel Waterbury (the "Hotel" or the "Company") petitions this Court under Sec. 10(f) of the National Labor Relations Act (the "Act"), 29 U.S.C. Sec. 160(f) (1988), for review of an order of the National Labor Relations Board (the "NLRB" or the "Board") dated September 23, 1993. The Board's Decision and Order (the "Order"), reported at 312 NLRB No. 61, found that the Company had committed certain unfair labor practices ("ULPs") during the course of an organizational campaign by Local 217, Hotel and Restaurant Employees' and Bartenders' Union, AFL-CIO (the "Union"). The Order directed the Company to cease and desist from the unfair labor practices, to post notices, to make whole all employees who lost earnings as a result of the unfair labor practices, and to recognize and bargain with the Union. The Board, pursuant to Sec. 10(e) of the Act, 29 U.S.C. Sec. 160(e), cross-petitions for enforcement of its Order.
 
 
 2
 In its petition, the Company challenges certain of the Board's findings that it committed unfair labor practices. It also contends that in any event, given various mitigating circumstances, a second election rather than a bargaining order is warranted in this case. For the reasons discussed below, we reject the Company's challenges to the Board's ULP determinations. We do, however, agree that a bargaining order is inappropriate in this case. Accordingly, with the exception of the portion of the Order requiring the Company to bargain with the Union, we grant enforcement.
 
 BACKGROUND
 
 3
 The Company operates a 279-room hotel in Waterbury, Connecticut that contains restaurants, bars, a sports complex, and banquet and conference facilities. The Hotel employs between 200 to 250 full-time and part-time employees depending on its level of business. In the spring of 1989, these employees became the target of an organizing campaign by the Union. The Union leafleted the Company, and throughout the summer, Union representatives phoned and visited employees at their homes.
 
 
 4
 On December 14, 1989, after obtaining a majority of authorization cards from the Hotel's employees (128 out of 220 employees), the Union requested recognition. Upon denial of its request, the Union petitioned for an election which was held on January 25, 1990. The Union lost the election by a vote of 104 against the Union, and 62 for the Union, with 21 challenged ballots.
 
 
 5
 The Union subsequently brought charges against the Company with the NLRB, alleging that the Company engaged in numerous ULPs before the election which played a strong role in the Union's loss of its majority status. The Union claimed that the Company engaged in the following illegal activities: threatening Union supporters, encouraging anti-union sentiment, overreacting to an alleged Union threat against one employee by using police presence to give the impression of imminent danger from the Union to employees, terminating Union supporters, and reducing the hours of Union supporters. The Union also claimed that the Company continued certain of these ULPs after the election.
 
 
 6
 The administrative law judge ("ALJ") found that the Company was guilty of some of the charged ULPs, but denied the general counsel's request for a bargaining order, directing a second election instead. The ALJ also ordered reinstatement and backpay for certain employees, and other traditional ULP remedies.
 
 
 7
 In reviewing the ALJ's determination, the Board found that a bargaining order was a more appropriate remedy than a second election. Having determined that the Company had an obligation to bargain with the Union as of the date of the petition, December 14, 1989, the Board also found that the Company violated the Act by unilaterally implementing certain changes without bargaining over them with the Union.
 
 
 8
 The Company now petitions for review of the Order, and the Board cross-petitions for its enforcement.DISCUSSION
 
 
 9
 (1) Evidence of Unfair Labor Practices
 
 
 10
 The Company first challenges the Board's findings concerning various ULPs. The Board's findings that an employer has committed unfair labor practices "cannot be lightly overturned." See NLRB v. J. Coty Messenger Serv., Inc., 763 F.2d 92, 96 (2d Cir.1985) (citation omitted). They must be upheld if supported by substantial evidence in the record as a whole. See NLRB v. Heads & Threads Co., 724 F.2d 282, 287 (2d Cir.1983). Where the Board's findings are based on the assessment of witness credibility they are entitled to "particular respect." NLRB v. Pace Oldsmobile, Inc., 681 F.2d 99, 101 (2d Cir.1982) (per curiam) ("Pace I"). Keeping in mind these limits on our scope of review, we briefly address some of the Company's challenges to the Board's ULP determinations.
 
 
 11
 a. Employee Eliza Svehlak
 
 
 12
 The Company first challenges all the Board's findings relating to employee Eliza Svehlak, claiming that any actions taken against her were not unlawful because she was a supervisor within the meaning of Sec. 2(11) of the Act. See, e.g., Robert A. Gorman, Basic Text on Labor Law, Unionization & Collective Bargaining 34 (1976) ("Supervisors normally may not invoke the employer unfair labor practice provisions of section 8(a), since they are not 'employees' whose joining of unions or engaging in concerted activities is protected by section 7"). That section defines a "supervisor" as
 
 
 13
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 14
 29 U.S.C. Sec. 152(11). The Board's findings regarding supervisory determinations are entitled to "special weight." See J.J. Newberry Co. v. NLRB, 645 F.2d 148, 154 (2d Cir.1981) (quotations omitted).
 
 
 15
 After reviewing Svehlak's duties as "laundry supervisor," the Board adopted the ALJ's determination that because Svehlak did not possess "any of the significant indicia of supervisory status" she was not a supervisor under the Act. Although Svehlak may have worn an identification tag noting that she was a supervisor, and was paid fifty-five cents an hour more than the other laundry employees, her supervisory duties were limited to deciding which department's laundry to do first and to assigning laundry duties to the other employees in the department. Given that Svehlak's decision-making responsibilities were of a routine nature, and there is no evidence that she was responsible for evaluating or disciplining the employees, we find that the Board's determination that she was not a supervisor is supported by substantial evidence.
 
 
 16
 b. Employee Roger Sauvageau
 
 
 17
 The Company challenges the Board's finding that employee Roger Sauvageau was discharged for engaging in union activities. Such employer action, if it occurred, violates both Sec. 8(a)(1) and Sec. 8(a)(3) of the Act. See, e.g., J. Coty Messenger, 763 F.2d at 98.
 
 
 18
 Sauvageau, an ardent and vocal union supporter, was fired after a confrontation concerning another employee took place between Sauvageau and a company supervisor, Kathy Tavares. Notably, Sauvageau's discharge took place before the Union had obtained its card majority. According to Sauvageau's version of the events leading up to the discharge, the version explicitly credited by the ALJ, Sauvageau accompanied a co-worker accused by Tavares of slacking off on the job to discuss the matter with Tavares. Tavares became enraged that Sauvageau was in her office, and, using profanity, demanded that he leave immediately. Sauvageau was later discharged by the Company's owner, Richard Calabrese, for "screw[ing] up" in his exchange with Tavares. The ALJ concluded that this reason was pretextual, and the true motivation behind the discharge was Sauvageau's organizing activities.
 
 
 19
 The record clearly supports the ALJ's determination. Tavares and Calabrese by their own admissions were aware of Sauvageau's union activities. In fact, the ALJ had found that Tavares had previously warned Sauvageau to "watch out" because he was on the Company's short list of union sympathizers. Calabrese, who only rarely became involved in employee discipline, fired Sauvageau without investigating the incident surrounding Sauvageau's alleged insubordination, despite the presence of other witnesses to the exchange. Sauvageau was not even given an opportunity to relate his version of the incident. Given these facts, it appears that the Company departed from its usual practice of assessing insubordination charges against employees on the basis of relevant mitigating circumstances. Such departure clearly supports the Board's determination that the Company used the exchange in Tavares's office as a pretext in order to discharge Sauvageau for his union activities. See, e.g., NLRB v. Del Rey Tortilleria, Inc., 787 F.2d 1118, 1124-25 (7th Cir.1986).
 
 
 20
 The record also supports the ALJ's determination that the Company's posting of a notice concerning Sauvageau's discharge violated Sec. 8(a)(1) of the Act. Following his discharge, Sauvageau had filed ULP charges with the Board. The Board's Regional Office decided to issue a complaint on his charges and the Company responded by posting notices stating that Sauvageau would "never work here again," and noting that "the Hotel is in the process of taking legal action against the ... Union." This language supports the ALJ's conclusion that the notice constituted "at least an implied threat of reprisal for Union support."
 
 
 21
 We have carefully examined the Company's remaining challenges to the Board's findings of ULPs and find them unpersuasive.
 
 
 22
 (2) Bargaining Order
 
 
 23
 The Company next claims that even if all the Board's ULP determinations are affirmed, given the circumstances of this case, a bargaining order is unwarranted. We agree. The issuance of a bargaining order is a rare remedy warranted only when it is clearly established that traditional remedies cannot eliminate the effects of the employer's past unfair labor practices. See, e.g., NLRB v. J. Coty Messenger Serv., Inc., 763 F.2d 92, 99 (2d Cir.1985) ("[A] bargaining order is an extraordinary and drastic remedy, is not favored, and should only be applied in unusual cases."); NLRB v. Jamaica Towing, Inc., 632 F.2d 208, 212 (2d Cir.1980). An election, not a bargaining order, remains the preferred remedy. See J.J. Newberry Co. v. NLRB, 645 F.2d 148, 153 (2d Cir.1981). "This preference reflects the important policy that employees not have union representation forced upon them when, by exercise of their free will, they might choose otherwise." NLRB v. Marion Rohr Corp., Inc., 714 F.2d 228, 230 (2d Cir.1983) (citations omitted).
 
 
 24
 The Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) approved the remedial use of bargaining orders in two types of cases involving employer misconduct. The first category of cases involves " 'outrageous' " and " 'pervasive' " ULPs. Id. at 613, 89 S.Ct. at 1940 (citation omitted). The second category involves "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." Id. at 614, 89 S.Ct. at 1940. As noted by both the ALJ and the Board, this case falls into Category II. In such cases, the general counsel must prove that: (1) the union was at some point supported by a majority of the bargaining unit employees; and (2) the employer's unfair labor practices undermined the union's majority strength and "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight." See id. at 614-15, 89 S.Ct. at 1940.
 
 
 25
 In determining the potential for a free and uncoerced election, we have emphasized that the Board must analyze not only the nature of the misconduct but "the surrounding and succeeding events in each case." J.J. Newberry Co., 645 F.2d at 153. Despite the presence of "hallmark" unfair labor practices such as the discharge of employees for their union support, the presence of mitigating circumstances may still preclude the granting of a bargaining order. See, e.g., J. Coty Messenger, 763 F.2d at 99; J.J. Newberry Co., 645 F.2d at 153. The ultimate analysis must focus on whether a bargaining order is appropriate under the conditions facing the Board at the time of its decision.
 
 
 26
 In the present case it is undisputed that the Company engaged in serious ULPs. Both before and after the election, among other things, the Company discharged or reduced the hours of noted union supporters. Despite these violations, in light of subsequent events, the ALJ determined that reinstatement of the discharged employees coupled with a second election would be an appropriate remedy. Specifically, the ALJ concluded that because of the significant employee turnover since the occurrence of the ULPs and the election, it was likely that the effects of the ULPs would not linger and prevent a fair second election. The Board disagreed and ordered the Company to bargain with the Union.
 
 
 27
 We hold, as we have on numerous occasions, that the Board erred in failing to consider events subsequent to the ULPs that bear on the propriety of issuing a bargaining order. See, e.g., NLRB v. Pace Oldsmobile, Inc., 739 F.2d 108, 112 (2d Cir.1984) ("Pace II"); J.J. Newberry Co., 645 F.2d at 154. Specifically, the Board failed to properly analyze evidence of workforce turnover coupled with the passage of time since the occurrence of the last ULP. Furthermore, the Board failed to convincingly explain the insufficiency of other traditional remedies.
 
 
 28
 a. Turnover
 
 
 29
 The consideration of employee turnover has long been a point of disagreement between the Board and this Court. See, e.g., J. Coty Messenger, 763 F.2d at 100-01 (criticizing Board for failing to consider evidence of employee turnover); Pace II, 739 F.2d at 111-12 (same); Marion Rohr Corp., 714 F.2d at 231 (same). Despite our repeated pronouncements that we consider turnover a relevant consideration militating against the issuance of a bargaining order, turnover has been conspicuously absent from the Board's analysis in these types of cases. Other circuits have similarly faulted the Board's analysis of these types of cases. See, e.g., Avecor, Inc. v. NLRB, 931 F.2d 924, 936-37 (D.C.Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992); NLRB v. Laverdiere's Enter., 933 F.2d 1045, 1054-55 (1st Cir.1991); Montgomery Ward & Co. v. NLRB, 904 F.2d 1156, 1159-60 (7th Cir.1990); NLRB v. Apple Tree Chevrolet, Inc., 671 F.2d 838, 841-42 (4th Cir.1982).
 
 
 30
 Although we recognize that sometimes an employer's improper practices may have so intimidated employees that a rerun election would not represent their true sentiments, where a significant number of employees who witnessed the Company's ULPs have moved on, the chances for a fair election may vastly increase. Moreover, given that, absent other indications that the chances of holding a fair rerun election would be slight, the issuance of a bargaining order in the face of significant employee turnover risks unjustly binding new employees to the choices made by former ones, we are particularly disturbed by the Board's failure to analyze turnover in these cases.
 
 
 31
 Perhaps finally recognizing this Court's strong feelings on the matter, the Board did grudgingly mention turnover. After finding that the ALJ erred by considering turnover where it "is not a relevant consideration under existing Board law," the Board stated that even if it decided to consider turnover, there was no evidence that managers and supervisors involved in the violation have left the Hotel's employ or that employee turnover was not itself a result of the unlawful conduct.
 
 
 32
 Regarding management turnover, the record belies the Board's claims; six of the fifteen managers referenced in the ALJ's decision had left the Company by the time of the trial. Furthermore, regardless of management turnover, we have previously held that significant employee turnover alone will militate against a bargaining order. See, e.g., J. Coty Messenger, 763 F.2d at 100; J.J. Newberry Co., 645 F.2d at 154. In this case, the record reveals that of the 244 employees present when the unfair labor practices began, 140 were no longer employed by the Company as of September 30, 1990, several weeks before the ULP hearings began. This represents a 57% turnover. Of the 193 employees present when the election took place, 80 employees had left by September 30, 1990. This represents a 41% turnover rate. Either figure represents a higher turnover rate than we have previously found persuasive. See, e.g., Marion Rohr Corp., 714 F.2d at 231 (35% turnover); NLRB v. Chester Valley, Inc., 652 F.2d 263, 273 (2d Cir.1981) (34% turnover).
 
 
 33
 The Board discounted the employee turnover because it found that there was no evidence that the turnover was not a result of the unlawful conduct. We have never required such a showing in the past. As long as there is no evidence that the turnover was connected to the ULPs, we have presumed that the turnover was a result of natural change. See, e.g., J. Coty Messenger, 763 F.2d at 100 ("lacking evidence of any connection between the unfair practices and the turnover, we do not see how it makes any difference that the turnover occurred during the time of the unfair practices"). In this particular case, there is evidence to support this presumption; the turnover rate in departments where the ULPs occurred mirrored turnover rates in other departments where there was no evidence of ULPs.
 
 
 34
 In sum, although the Board finally mentioned employee turnover in considering whether a bargaining order should issue, its analysis of the issue seems cursory at best.
 
 
 35
 b. Other factors militating against bargaining order
 
 
 36
 Another factor weighing against the imposition of a bargaining order that the Board failed to consider is the passage of time since the Hotel's ULPs. Because a bargaining order must be appropriate when issued, not at some earlier date, see, e.g., Pace II, 739 F.2d at 110, the Board's failure to consider this factor is troubling. Although the Company continued to engage in ULPs after the Union had already lost the election, the last ULP occurred in May 1990. The Board did not issue its Order until more than three years later, on September 23, 1993. The passage of so much time sheds doubt on the Board's finding that the Hotel employees continue to feel the effects of the ULPs. In addition to the possibility that employees may have totally forgotten the incidents, enough time may have passed to have at least made the chance of a fair rerun election greater than "slight."
 
 
 37
 Although the passage of three years is not itself sufficient to indicate that the effects of the Company's ULPs will no longer be felt, coupled with the other factors in this case it leads us to conclude that a bargaining order would be inappropriate at this time. Specifically, the high employee turnover, the large number of employees in the bargaining unit, and the fact that Sauvageau's discharge took place before the critical petition period factor into our decision that the attendant circumstances of this case indicate that a bargaining order is unwarranted.
 
 
 38
 In sum, the Board has failed to convince us that a bargaining order is warranted in this case. Other than a brief, unpersuasive response to the ALJ's consideration of employee and management turnover, the Board did nothing besides simply state that the nature of the Company's violations would preclude a fair rerun election. Given the facts of this case, such is not enough. Accordingly, we deny enforcement of the bargaining order.
 
 CONCLUSION
 
 39
 The Order is enforced except to the extent that it requires the Company to bargain with the Union. Because the language of the Board's proposed cease and desist order and notices to be posted were premised on the issuance of a bargaining order, we remand the case with directions to modify the order and notices to accord with this opinion. On remand, although the Board may no longer consider the imposition of a bargaining order as we have found such an order unwarranted in this case, the Board is free to consider whether a rerun election is appropriate.