**HARPERCOLLINS SAN FRANCISCO, a Division of HarperCollins Publishers, Inc., Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross– Petitioner,**

**Communications Workers of America, Intervenor.**

Nos. 598, 828, Dockets 95–4076(L), 95–4090(XAP).

United States Court of Appeals, Second Circuit.

Argued Nov. 27, 1995.

Decided March 26, 1996.

Gotshal & Manges, New York City, on the brief), for Petitioner–Cross–Respondent.

William M. Bernstein, National Labor Relations Board, Washington, D.C. (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., on the brief), for Respondent–Cross–Petitioner.

James B. Coppess, Washington, D.C., for Intervenor.

Before: ALTIMARI and JACOBS, Circuit Judges, and CONNER*, District Judge.

ALTIMARI, Circuit Judge:

Petitioner-cross-respondent HarperCollins San Francisco ("HarperCollins" or the "Company"), a Division of HarperCollins Publishers, Inc. ("HarperCollins, Inc."), petitions this Court under § 10(f) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(f), for review of an order of respondent-cross-petitioner National Labor Relations Board (the "NLRB" or the "Board") dated April 28, 1995. The Board's Decision and Order (the "Order"), reported at 317 N.L.R.B. 168 (1995), found that the Company had committed certain unfair labor practices ("ULPs") during the course of an organizational campaign by intervenor, Communications Workers of America, AFL–CIO ("CWA" or "Union"). The Order directed HarperCollins to cease and desist from the unfair labor practices, to post notices, and to recognize and bargain with the Union as the lawful representative of its employees. The Board cross-petitions for enforcement of its Order pursuant to § 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

In its petition, HarperCollins challenges the Board's finding that it committed unfair labor practices. The Company also contends that even if all the Board's ULP determinations were supported by the record, given various mitigating circumstances in this case, a bargaining order was an unwarranted and excessive remedy. While we reject Harper-

Mark A. Jacoby, Weil, Gotshal & Manges, New York City (Jenifer A. Magyar, Weil,

* William C. Conner, United States District Judge for the Southern District of New York sitting by designation.

Collins' challenges to the Board's ULP findings, we conclude that a bargaining order is not justified in this case. Accordingly, with the exception of the portion of the Order requiring HarperCollins to bargain with the Union, we grant enforcement.

## BACKGROUND

The Company, a division of HarperCollins Inc., is engaged in the publication and sale of books and related media in San Francisco. During the summer of 1992, the Company consolidated all its operational divisions into a single division at one facility. At relevant times, the Company employed approximately 75 individuals in 60 non-management job classifications.

As early as the summer of 1992, the Company's employees discussed the possibility of union representation, and certain employees met with officials of the CWA. The Union began an organizational campaign, and on December 18, 1992, after obtaining a majority of authorization cards from the Company's employees (57 out of 75 employees), the Union requested recognition. Upon denial of its request, the Union filed a representation petition with the Board. Hearings on the appropriate bargaining unit were conducted in January and February 1993, and the Board directed that an election be held on June 18, 1993.

In the aftermath of the demand for union representation, a number of actions by HarperCollins' management were construed as coercive by pro-union workers. The anti-union actions in question, all of which took place in January of 1993, were as follows.

### A. Tabori Meeting

On January 5, 1993, Lena Tabori, President of one of HarperCollins' divisions, hosted a meeting in her office for approximately 25 employees to discuss union representation. During the course of that meeting, an unidentified supervisor told the employees that union representation would result in the loss of benefits, more rigid job descriptions, and decreased salaries for many of the individuals attending the meeting. While Tabori did not actively adopt the statements of the unidentified supervisor, she did nothing to disavow their accuracy.

### B. Goldman to Hyams

Mark Goldman, a supervising employee, approached Gina Hyams, a union supporter, in her cubicle and informed her that union representation would result in lost benefits. Hyams responded that HarperCollins New York, another division of HarperCollins, Inc., had been represented for 20 years without incident. Goldman insisted that there was no comparison between the two situations.

### C. Brown Meeting

Manager Carol Brown met with employees Julie Wunderlich and Kathryn Bader and asked them what they hoped a union would achieve. When they replied that they wanted a voice in determining their benefits and working conditions, Brown informed them that they had more control over those things without a union and that if they unionized HarperCollins would not negotiate with them (or would negotiate short contracts and "always be under negotiations").

### D. Brokering Meeting

Supervisor Mark Brokering held a meeting of his department. During the meeting, a pro-union employee stated that the employees wanted a voice in their contract. Brokering replied that if employees were unhappy with HarperCollins, it might be time for them to move elsewhere. He also stated that unionization would result in more rigid job descriptions and less opportunity for special projects.

### E. Baltz's Office

Monica Baltz, an active pro-union employee, had shared an office with her supervisor before the union issue arose; subsequently, her supervisor was made a member of the management's anti-union task force. Accordingly, on January 10, 1992, Baltz was informed that she would have to vacate the office, and she was placed in a cubicle with one-third of the work space of her old office. Meanwhile, an intern who had been utilizing the cubicle was moved to a much larger open office across the hall. When Baltz told Tabo-

ri that she believed the change in office was punitive for her pro-union activities, she was informed that she could not be moved into the large vacant office because it might be seen as rewarding her union activities.

In addition to the incidents chronicled above, George Craig, the CEO of HarperCollins Inc., gave a speech to all employees of the Company at a meeting held on February 9, 1993. In that speech, Craig made a number of comments which were construed as coercive by pro-union workers. For example, Craig stated:

> I could write a book on the conflicts which I have lived through during the last twenty-five years and maybe one day I will. . . . I'm sure you get the message that the [C]ompany will fight this action—which I personally see as extremely disloyal and ill-conceived—with every weapon at our disposal because it's nothing short of war, with the battle being about preventing this wonderful business from being destroyed.

Moreover, in response to a question at the meeting as to what the Company would do in the event the San Francisco employees struck, Craig offered two possibilities. First, Craig suggested that the Company could always hire replacement workers. Second, Craig stated that because of the technology of electronic publishing, the Company could move its operations to another city.

Further, when an employee asked Craig about the difference between a union and an employee association, Craig stated that he "liked working with the association [in his New York office]" because it was "pro-company and loyal." In contrast, Craig stated that while he could work with an association, he would not work with a union. When asked what alternative the employees had to a union, Craig stated that if the employees "dropped this union bullshit," he would "sit down and discuss [their] problems."

The election was held, as scheduled, on June 18, 1993. The Union lost the election by a vote of 36 against the Union, and 31 in favor of the Union, with 4 challenged ballots. The Union subsequently lodged charges against HarperCollins with the NLRB, contesting the election and contending that HarperCollins engaged in numerous ULPs

prior to the election which contributed to the Union's loss of majority status. The Union alleged that HarperCollins violated § 8(a)(1) of the Act by: (1) threatening Union supporters with loss of benefits and refusal to bargain if they selected the Union as their bargaining representative; (2) threatening Union supporters with discharge and the withholding of promotions; (3) warning employees that their support for the Union was extremely disloyal to the Company; (4) stating to employees that its campaign against the Union was akin to a "war" and threatening to fight it with unlawful conduct; (5) threatening employees with closure of the facility and relocation if they engaged in a concerted work stoppage; and (6) soliciting employee grievances with implicit promises to rectify them. In addition, the Union alleged that HarperCollins violated § 8(a)(1) and (3) of the Act by reassigning employee Baltz to a cubicle (as opposed to a vacant office) as a result of her pro-union activities.

The administrative law judge ("ALJ") found that the Company was guilty of most of the charged ULPs and recommended, among other remedies, a bargaining order. In reviewing the ALJ's determination, the Board summarily adopted the ALJ's findings and recommended remedies. In doing so, the Board denied the Company's motion to reopen the record to introduce evidence of employee turnover occurring after the Union filed its petition for representation.

The Company now petitions for review of the Order, and the Board cross-petitions for its enforcement.

## DISCUSSION

### A. Evidence of Unfair Labor Practices

■ The Board's April 28, 1995 Order was based on the ALJ's finding that the Company engaged in unfair labor practices. While HarperCollins does not challenge any of the ALJ's credibility findings, the Company contends on appeal that the Board's determination that the Company had committed ULPs was unsupported by substantial evidence. Our review of the Board's findings that an employer has committed unfair labor practices is quite limited. *See J.L.M., Inc. v.*

*NLRB*, 31 F.3d 79, 82 (2d Cir.1994). Indeed, we must reject HarperCollins' claims if there is substantial evidence in the record as a whole to support the Board's conclusions. *See id.* Bearing in mind the limited nature of our review, we briefly address some of HarperCollins' challenges to the Board's ULP determinations.

### 1. *Craig's Speech*

The Company first challenges all the Board's findings that HarperCollins, through its CEO Craig, engaged in conduct violative of § 8(a)(1) of the Act and suggests that the Board overlooked well-established free speech rights of an employer recognized under § 8(c) of the Act.

■■■■ Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). It is well-established that an employer violates § 8(a)(1) by, among other things, (1) promising to grant benefits in an effort to discourage union support; (2) threatening to discharge employees in retaliation for union activity; and, in certain circumstances, (3) threatening to close a plant. *See Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1427 (2d Cir.1996). Where, however, an employer's exhortations contain no threat of reprisal or promise of benefit, an employer may communicate " 'any views, argument, or opinion' in any media form without committing an unfair labor practice." *NLRB v. Pratt & Whitney Air Craft Div., United Technologies Corp.*, 789 F.2d 121, 134 (2d Cir.1986) (quotation omitted).

As a preliminary matter, we observe that the Board adopted the ALJ's specific credibility findings, which HarperCollins does not now challenge. Specifically, the ALJ determined that:

> In contrast to alleged discriminatees Wunderlich, Balzarano, and Hyams, each of whom appeared to be testifying in an honest and straightforward manner, and, in particular, to Caroline Pincus, who impressed me as honestly attempting to recall the events about which she testified and who, notwithstanding her status as a

current employee, testified adversely to [HarperCollins'] interests, Craig's demeanor, while testifying, was that of an utterly disingenuous witness, and I believe that, in order to buttress [HarperCollins'] legal position, he fabricated significant portions of his testimony.

In light of his credibility findings, the ALJ determined that Craig's speech, as recounted by employee witnesses, violated § 8(a)(1) of the Act in a number of respects.

#### a. *Threat of Plant Closure*

■■ HarperCollins challenges the Board's finding that the Company committed a "hallmark" violation of the Act when its CEO threatened to close the San Francisco office in the event of a work stoppage. *See NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 272 (2d Cir.1981) ("hallmark" violation constitutes exceptional misconduct and includes such action as threats of plant closure). According to HarperCollins, Craig merely meant to suggest in the event of a strike, electronic publishing technology made it possible to shift the work to another location.

A review of the record indicates that the ALJ credited the testimony of two bargaining unit employees on this subject. One employee testified that Craig responded to a question by stating "if CWA caused a strike that they could easily find other people to do the work." The other employee, Hyams, testified that Craig said "with the technology available in publishing today ... they didn't need to stay in San Francisco, that they could just move their offices because they didn't need the hassle of a union or of a strike." Given these statements, Craig's position as CEO of HarperCollins, Inc., Craig's angry demeanor, and the fact that he addressed his views directly to all the Company's employees, we find there is substantial support in the record to justify the ALJ's and the Board's determination that Craig's statements violated § 8(a)(1) of the Act.

#### b. *Disloyalty*

■■ The NLRB adopted the ALJ's conclusion that "[b]y denigrating the employees' support for the Union as being 'disloyal' to

[HarperCollins], Craig engaged in discourse transcending that which may [be] privileged by Section 8(c) of the Act, thereby engaging in conduct violative of Section 8(a)(1) of the Act." HarperCollins argues on appeal that Craig's statement that he perceived the Union action "as extremely disloyal and ill-conceived" merely suggested that there would inevitably be "split loyalties" or an "institutionalized divide" as a result of unionization.

■ Despite HarperCollins' argument, the record clearly supports the ALJ's determination. It is well-settled that statements equating union activity with disloyalty to the employer constitute coercion in violation of § 8(a)(1) of the Act. *See Misericordia Hosp. Medical Ctr. v. NLRB,* 623 F.2d 808, 811–12 (2d Cir.1980); *NLRB v. Gladding Keystone Corp.,* 435 F.2d 129, 132–33 (2d Cir.1970). The combination of Craig's position as the Company's senior management official, the ALJ's ruling that Craig's tone was loud and angry, and the hostile, highly personal reference to union organizers as "disloyal" was sufficient to support the ALJ's and the Board's conclusion that there was an attempt to coerce employees into abandoning the Union, as well as an implicit threat of repercussions for union loyalty, as opposed to company loyalty.

#### c. *The War*

■ The Board also adopted the ALJ's determination that, "Craig's references to the 'battle' against the Union as being analogous to war and to [HarperCollins'] intent to fight it 'with every weapon at our disposal' were clearly coercive and violative of Section 8(a)(1) of the Act inasmuch as said comment clearly conveyed to the listening employees the threat that [HarperCollins] would use any means, including unlawful conduct, in order to defeat the Union." As with Craig's reference to disloyalty, HarperCollins argues that Craig was merely stating his opposition to unionization and the fact that HarperCollins intended to fight against it.

At first blush, Craig's statement about engaging in a war against the Union cannot, on its face, fairly be read to imply that he would use illegal means to defeat the Union. However, when viewed within the context of the rest of the speech, there is sufficient evidence to support a finding that § 8(a)(1) of the Act had been violated. The ALJ had already noted Craig spoke in an angry and loud tone, referred to the Union as "bullshit" and made other unlawful comments. Moreover, the "war" statement was preceded by the accusation that employees who engaged in organizational activities were "extremely disloyal," and was followed by Craig's threat in the same speech that he would close down the plant if the union struck. The very fact that a plant closure, which Craig made clear was one possible Company response to union activity, is an illegal means with which to fight the Union, *see NLRB v. J. Coty Messenger Serv.,* 763 F.2d 92, 97 (2d Cir.1985), supports the ALJ's and the Board's conclusion that Craig was implicitly threatening unlawful action in his "war" against the Union.

#### d. *Solicitation of Grievances*

■ Finally, it is a violation of § 8(a)(1) of the Act to seek grievances from employees and promise to rectify them if the demand for collective bargaining is dropped. *See id.* at 96 ("An employer violates § 8(a)(1) of the [A]ct when it grants or promises to grant benefits to discourage employee support for a union."). The ALJ credited testimony to the effect that Craig stated "if [the employees] dropped this union bullshit, then he would sit down and discuss our problems and that [the employees] would find that he's a very good listener." While HarperCollins contends that Craig was ingenuously stating that he is "a good listener," the ALJ determined that "[c]learly, as alleged in the complaint, this remark constituted nothing less than a promise to the listening employees, by Craig, that he would redress their grievances if they abandoned their support for the Union."

The record indicates that Craig's statement was expressed at the same meeting where he (1) threatened to close the plant if employees chose the Union, (2) would "deal with an association but not with the Union," (3) accused Union supporters of being disloyal, and (4) made clear that their disloyalty was taking place within the context of a

"war" that the Company would fight with "every weapon" at its disposal. Given the context of Craig's speech, Craig's position, and the fact that the statements were expressed at a meeting of the Company's entire non-management employees, the ALJ's and the Board's conclusion that Craig promised benefits to thwart the Union campaign is fully justified by the record.

### 2. Baltz's Office

The Company challenges the Board's findings that HarperCollins violated § 8(a)(1) and (3) by relocating Baltz to an inferior office and failing to assign Baltz a vacant office because of her support for the Union.

 Section 8(a)(3) of the Act prohibits an employer from "discrimination in regard to hire or tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer violates § 8(a)(1) and (3) by imposing more onerous working conditions on an employee because of the employee's support for a union. See NLRB v. Jack La Lanne Management Corp., 539 F.2d 292, 294 (2d Cir.1976).

██ While Baltz had shared a spacious office with her supervisor for years, after the CWA's petition was filed, she was reassigned to a small cubicle. Despite HarperCollins' explanations for the reassignment—namely, that it could not have a union organizer and an anti-union management employee sharing an office—there is ample support in the record for the ALJ's and the Board's conclusion that Baltz was reassigned to a cubicle approximately a third of the size of her previous working space as retribution for her activities on behalf of the Union. This conclusion is bolstered by the fact that a more spacious office remained open while Baltz was assigned to a cubicle. Indeed, a week after Baltz was relocated to a cubicle, she approached Company Division President Tabori to ask why she was not given the vacant office. Tabori told Baltz that office space was a " 'vital' employee concern" and that to have moved her into the large vacant office would have made it appear to other employees as if Baltz "were being rewarded for [her] union activity." Clearly, this language

supports the ALJ's and the Board's determination that Baltz was relocated to a work cubicle, rather than a vacant office, for discriminatory reasons in violation of § 8(a)(1) and (3).

We have carefully examined HarperCollins' remaining challenges to the Board's ULP determinations and find them unpersuasive. In short, the record provides ample support for all of the NLRB's conclusions that HarperCollins engaged in unfair labor practices.

### B. Bargaining Order

 The Company next claims that even if it did commit the alleged unfair labor practices, given various mitigating circumstances, a bargaining order is unwarranted in this case. We review the issuance of a bargaining order for an abuse of discretion. See Kinney Drugs, Inc., 74 F.3d at 1428.

We have repeatedly held that "a bargaining order is a rare remedy warranted only when it is clearly established that traditional remedies cannot eliminate the effects of the employer's past unfair labor practices." J.L.M., Inc., 31 F.3d at 83; see J. Coty Messenger Serv., Inc., 763 F.2d at 99 ("[A] bargaining order is an extraordinary and drastic remedy, is not favored, and should only be applied in unusual cases."). A new election, not a bargaining order, is the preferred remedy for employer misconduct which taints a union election. See J.L.M., Inc., 31 F.3d at 83. Such an order in lieu of a second election is "only proper if, after an objective review of all of the relevant surrounding circumstances, including the nature of the employer's misbehavior and any later events bearing on its impact on the employees, it may reasonably be concluded that the employees will be unable to exercise a free choice in a Board-supervised rerun election." NLRB v. Jamaica Towing, Inc., 632 F.2d 208, 212 (2d Cir.1980). We are unpersuaded that such a conclusion is justified in the case before us.

 In NLRB v. Gissel Packing Co., the Supreme Court approved the issuance of a bargaining order in two categories of cases: "exceptional cases marked by outrageous and

pervasive unfair labor practices" ("Category I") and "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" ("Category II"). 395 U.S. 575, 613–14, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969) (internal quotations omitted). In the instant case, the ALJ and the Board concluded that HarperCollins' violations fell within Category II. In such a case, a bargaining order may issue only if: (1) a majority of employees have shown support for the union; (2) the employer's unfair labor practices undermined the majority strength of the union; and (3) the "possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and [ ] employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Id.* at 614–15, 89 S.Ct. at 1940. Such an order, however, is only an "appropriate remedy for those practices [that] … are of 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.'" *Id.* at 614, 89 S.Ct. at 1940 (citation omitted).

In support of the issuance of a bargaining order, the ALJ describes what he refers to as a concerted effort to "nip union organization in the bud." According to the ALJ, HarperCollins' management employees began dissuading employees from unionization throughout the month of January 1993 by committing repeated ULPs. Those efforts were followed up by CEO Craig's speech in February 1993 in which he committed a number of § 8(a)(1) violations, including the threat of closing the plant, a "hallmark" violation of the Act. The ALJ determined that these violations were of such a nature—particularly in light of the fact that Craig remains the CEO of HarperCollins, Inc. and is in the best position to make good on his threat to close the office—that a bargaining order is merited.

Despite HarperCollins' efforts to have the Board consider employee turnover when determining if the bargaining order was war-ranted, the Board declined, asserting that such consideration was irrelevant to the issuance of a *Gissel* bargaining order. Similarly, the ALJ and the Board did not consider the passage of time since HarperCollins committed its ULPs. According to the ALJ, "[the] validity of a bargaining order depends on an evaluation of the circumstances when the unfair labor practices were committed…." Thus, the ALJ and the Board determined that the pernicious effect of HarperCollins' ULPs (particularly those committed by the CEO of the Company) made a fair election unlikely and warranted the issuance of a bargaining order.

■■■■■■ The mere recitation of unfair labor practices, accompanied by a conclusory statement that the possibility of conducting a fair rerun election by use of traditional remedies is slight, does not satisfy the NLRB's responsibility to analyze the attending circumstances. *See NLRB v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 101 (2d Cir.1982) (per curiam) ("*Pace I*"). Moreover, the NLRB may not, as it has here, totally disregard circumstances subsequent to the ULPs that weigh against the imposition of a bargaining order. *See, e.g., NLRB v. Pace Oldsmobile, Inc.,* 739 F.2d 108, 112 (2d Cir.1984) ("*Pace II*"). Specifically, the NLRB has once again flouted the mandates of this Circuit and has ignored our consistent holdings that "events subsequent to the employer's violations, such as the passage of time and the substantial turnover of employees, are relevant and important factors which should be considered" in an effort to assess the possibility of a free and uncoerced election under current conditions. *NLRB v. Marion Rohr Corp.,* 714 F.2d 228, 231 (2d Cir.1983). Again we must fault the Board for failing to undertake the proper analysis and "show that the bargaining order is appropriate when it is issued, not at some earlier date." *Id.*

In considering employee turnover as a relevant factor militating against enforced bargaining, we observe that while "sometimes an employer's improper practices may have so intimidated employees that a rerun election would not represent their true sentiments, where a significant number of employees who witnessed the Company's ULPs have moved

on, the chances for a fair election may vastly increase." *J.L.M., Inc.*, 31 F.3d at 84. Despite the fact that HarperCollins experienced a 57% turnover rate in the bargaining unit from the time the CWA's representation petition was filed in December of 1992 to December 1994 when the matter was presented to the Board, *see, e.g., Marion Rohr Corp.*, 714 F.2d at 231 (rejecting bargaining order in face of 35% turnover); *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 273 (2d Cir.1981) (rejecting bargaining order in face of 34% turnover), the Board denied the Company's motion to reopen the record on the ground that evidence of employee turnover was "irrelevant." As we have repeatedly pronounced, when there has been a large rate of employee turnover between the time of the ULPs and the Board's order, "[t]he effect of a bargaining order could thus easily be to impose upon the employees a union not desired by a majority of them." *NLRB v. Knogo Corp.*, 727 F.2d 55, 60 (2d Cir.1984) (internal quotations omitted).

Another factor that the NLRB failed to consider that militates against enforced bargaining is the passage of time since HarperCollins' ULPs. *See id.* ("[S]ubstantial lapse of time casts doubt on whether the employee preference for the union, expressed ... through authorization cards, still reflect[s the] majority."); *J.L.M., Inc.*, 31 F.3d at 85 (the passage of time "sheds doubt on the Board's finding that ... employees continue to feel the effects of the ULPs"). In the case before us, the Board erred in refusing to consider that (1) over two and one-half years have passed since the authorization cards were solicited and signed; and (2) no ULPs were committed between the time of Craig's speech in February 1993 and the Board's issuance of the bargaining order in April 1995. While the passage of time alone is not sufficient "to indicate that the effects of the Company's ULPs will no longer be felt, coupled with the other factors ... it leads us to conclude that a bargaining order would be inappropriate at this time." *J.L.M., Inc.*, 31 F.3d at 85. Specifically, the substantial employee turnover rate of 57%, the fact that the Company refrained from engaging in further anti-union conduct, and the absence of any reasoned analysis regarding the inadequacy

of traditional remedies factor into our conclusion that the attendant circumstances of this case do not warrant the issuance of a bargaining order.

## CONCLUSION

Accordingly, that portion of the order directing the Company to bargain with the Union is vacated and enforcement thereof is denied. In all other respects, enforcement is granted.